NUNC PRO TUNC
3/26/20

```
┌─────────────────────────────┐
│           FILED             │
│   ┌─────────────────────┐   │
│   │     Apr 24 2020      │   │
│   └─────────────────────┘   │
│   CLERK, U.S. DISTRICT COURT │
│ SOUTHERN DISTRICT OF CALIFORNIA │
│ BY        s/ Julieo    DEPUTY │
└─────────────────────────────┘
```

1  Peter Strojnik (Sr.),
2  7847 N. Central Ave.
   Phoenix, Arizona 85020
3  602-524-6602
   ps@strojnik.com
4

5          **UNITED STATES DISTRICT COURT**
           **SOUTHERN DISTRICT OF CALIFORNIA**
6

7  PETER STROJNIK,                        Case No: 19-cv-0650

8                      Plaintiff/Counter-     **MOTION FOR SUMMARY**
   Defendant/Counter-Counter-Claimant,            **JUDGMENT**
9                                                   **RE**
                                          **DEFENDANT'S VEXATIOUS**
10                 vs.                        **LITIGANT MOTION**

11
   EVANS HOTELS, LLC. Dba THE
12 LODGE AT TORREY PINES

13          Defendant/Counter-Claimant/Counter-
14                      Counter-Defendant.

15
16                      **SUMMARY**

17     Defendant seeks to have Plaintiff declared a vexatious based on the assertion that:

18     Because Mr. Strojnik's litigation history is expansive, and typically frivolous
       and harassing, this Court has ample record from which to issue the requested
19     pre-filing order against Mr. Strojnik to curb his vexatious litigation[1].

20     Strojnik is a private attorney general and an ADA tester. *See CREEC*[2]. As such, he

21 files many ADA civil rights discrimination cases. Therefore, the burden is on Evans to

22 show that Strojnik's ADA civil rights desegregation cases are enforcement are *patently*

23 *without merit. Molski v. Evergreen Dynasty Corp.,* 500 F.3d 1047, 1059 (9th Cir. 2007).

24     Thus far, Evans has been unable to produce even one such case for a simple reason:

25 There isn't one. Therefore, at the hearing on December 10, 2019, Evans pivoted from

26 claiming that Strojnik's civil rights cases are *frivolous* to arguing that Strojnik does not

27 ─────────────────────────
   [1] *See* Motion [Dkt. 8] at 6:17-19.
28 [2] *Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093, 1099 (9th Cir.
   2017) ("*CREEC*").

suffer from a "disability" as this term is defined in the 2008 ADA Amendment Act and 28 C.F.R. 36.105. Evans requested that the Court order Strojnik to submit to an independent medical examination to determine whether Strojnik's impairments constitute ADA disabilities. The IME was conducted by Dr. Greenfield, a San Diego orthopedic surgeon. The parties confirmed to the scope of the examination ordered on December 10, 2019[56][3]:

> Whereas, the scope of Dr. Greenfield examination shall be to determine whether Mr. Strojnik's condition(s) fall within the definitions of "disability" pursuant to 2008 ADA Amendment Act and 28 C.F.R. 36.105 and assess impact and limitations on major life activities related thereto as related to allegations of obstacles or ADA violations in complaint.

Unbeknownst to Strojnik, however, Ms. Casillas, one of Evans' lawyers, contacted Dr. Greenfield prior to the examination and instructed him to conduct an "orthopedic examination" unrelated to the definition of ADA disability. [88] During the examination, Dr. Greenfield confided that he was not an ADA disability expert[4]. *Id.*

Dr. Greenfield's Report is attached. Exhibit 1. Since Dr. Greenfield was instructed to conduct an *orthopedic* examination and not the ordered *ADA* examination, it is of little, if any, value.

In this Motion, Strojnik addresses, analyses and responds to what appear to be the elements of Evans' claims of vexatiousness claims:

1. Whether any cases brought in this District Court are plainly without merit; and
2. Whether Strojnik suffers from disability as defined in the 2008 ADAAA and 28 C.F.R. 36.302; and
3. Whether Strojnik filed a "harassing" case against Evans.

The answer to these questions is a resounding "no".

---

[3] From memory; please review transcript available to the Court and Evans for confirmation.
[4] The false instruction to Dr. Greenfield represents a violation of 18 U.S.C. 1512 (b) which prohibits any person from engaging in misleading conduct toward another person with the intent to influence the testimony of such person in an official proceeding.

# MEMORANDUM

## 1. Evans lacks Article III Standing to Bring the Vexatious Litigant Motion

In *Obesity Research Institute, LLC v. Fiber Research International, LLC* (2018 S.D.Cal. 15-cv-00595-BAS-MDD) Judge Bashant noted:

> "A federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears." *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989) (citation omitted). "Article III of the Constitution confines the federal courts to adjudication of actual 'Cases' and 'Controversies.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 590 (1992). "[T]he core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III." *Id.* at 560 (citation omitted). The "irreducible constitutional minimum" of Article III standing is comprised of three elements: (1) "the plaintiff must have suffered an 'injury in fact' . . . which is (a) concrete and particularized; and (b) 'actual or imminent, ' not 'conjectural' or 'hypothetical'"; (2) "there must be a causal connection between the injury and the conduct complained of" such that the injury is "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court"; and (3) "it must be 'likely, ' as opposed to merely 'speculative, ' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 560-61 (citations omitted). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Id.* at 561.

Here, Evans has not shown any of the 3 elements of standing and, therefore, Evans' claim must be dismissed for lack of standing.

## 2. Strojnik's ADA Civil Rights Desegregation Lawsuits are Patently Meritorious.

### a. Definition of "Meritorious"

Of the 23 cases filed by Strojnik in this District, none has been dismissed either procedurally pursuant to Fed. R. Civ, P. 12(b)(1) or on the merits. Exhibit 14[5]. Of more than 100 cases filed by Strojnik in all of California District Courts, 4 have been dismissed procedurally for lack of standing.  All are on appeal:

---

[5] Strojnik attached Exhibit 14 because Evans variously alleges that Strojnik is filing ADA cases for money. Untrue. In fact, during the past several years working as a civil rights lawyer in the Maricopa County Superior Court, Strojnik earned $1.2M and donated every single penny of the $1.2M to a 501(c)(3) organization for the disabled.

| Case | Dist. Ct. No. | Appeal No. |
|------|---------------|------------|
| *Strojnik v. Singpoli Group, LLC* | Central 2:19-cv-00066 | 19-55310 |
| *Strojnik v. Four Sisters Inns* | Central 2:19-cv-02991 | 19-56523 |
| *Strojnik v. Orangewood, LLC* | Central 8:19-cv-00946 | 20-55162 |
| *Strojnik v. Pasadena Robles Acquisition, LLC* | Central 2:19-cv-02067 | 19-56037 |

The above cases were dismissed on jurisdictional grounds. Jurisdictional dismissal is not on the merits. *Ruiz v. Snohomish Cty. Pub. Util. Dist. No. 1*, 824 F.3d 1161, 1164 (9th Cir. 2016) Therefore, the dismissed and appealed cases do not relate to vexatiousness.

It is notable that only Central District Court's decisions need to be appealed. Other districts correctly applied the *CREEC* decision. *See, e.g., Johnson v. Alhambra & O Associates* (2019 E.D. Cal. 2:19-cv-00103 at Dkt. 15), Exhibit 2, *Strojnik v. The Victus Group* (E.D. Cal. 1:18-cv-01620 at Dkt. 15), Exbibit 3, and *Strojnik v. GF Carneros Tenant, LLC* (N.D. Cal. 3:19-cv-03583 at Dkt. 28), Exhibit 4.

And in this case, the Court entered judgment for Strojnik [22] thus implicitly recognizing its jurisdiction over Strojnik's ADA claim and the validity thereof.

**b. Strojnik is Extraordinarily Cautions in Filing ADA Civil Rights Cases Because of the Intolerable Social Skepticism and Hostility to ADA Plaintiffs that has Permeated some District Courts.**

Strojnik, as Congress[6], is acutely aware of the subtle, but prevalent social hostility toward the disabled. Therefore, Strojnik treads carefully before filing an ADA civil rights action. Before filing any ADA lawsuit, Strojnik prepares a pre-filing due diligence report, attaches it to a draft Complaint and submits it to the offending public accommodation along with a courtesy pre-filing letter. In the matter at hand, Strojnik sent a letter to Mr. Gross[7], Exhibit 5, which stated, in part:

> I am a disabled veteran and an ADA tester. I intended to visit your Hotel on December 8, 2018. During my booking procedure I noted that the Hotel does not provide equal access as required by 28 CFR §36.302(e), and during my

[6] *See* 42 U.S.C. §12101 (a) and (b)

[7] The Court will recall that the initial Complaint named "Torrey Pines Club Corporation dba The Lodge At Torrey Pines" as defendant. [1] Strojnik then learned that Torrey Pines Club Corporation was not the proper defendant, and accordingly amended the Complaint to name Evans Hotels, LLC in the FAC. [3]

1    stay there I noted that it does not comply with the 2010 Standards of
2    Accessibility Design or California's Unruh and DPA.

3    In the preparation of the attached draft Complaint, I gathered information
     from third party booking agent's website and other third party websites. This
4    information may be old and not reliable; therefore, let me know any
5    corrections that should be incorporated into the draft Complaint. Further,
     please review the attached 2010 Standards for Accessibility Design and,
6    pursuant to 28 CFR §36.302(e), disclose which of the mobility requirements
7    have not been met.

8        Strojnik's caution is grounded in recognition of a dangerous pattern in the evolution

9    in ADA civil rights  cases.  Some ableist advocates rely on public disdain against the

10   disabled as a furtive reconnaissance mission to determine whether the memorable

11   observation by the Honorable Judge Melinda Harmon in *Gilkerson v. Chasewood Bank*, 1

12   F.Supp .3d 570, 596-97 (S.D. Tex., 2014) apply in their case. In *Gilkerson,* Judge Harmon

13   displayed the courage to state what civil rights litigants know from experience:

14   Testers have been an accepted and successful means of enforcing civil rights
15   statutes under the Fair Housing Act and Title VII of the Civil Rights Act of
     1964, although **a number of courts addressing Title III cases have been**
16   **skeptical, and even hostile**. *See* Lee, *Giving Disabled Testers Access to*
17   *Federal Courts,* 19 Va. J. Soc. Pol'y & L. at 321–23; Johnson, *Testers*
     *Standing up for Title III of the ADA,* 59 Case W. Res. L.Rev. at 689–702.
18   "As a result of both the Attorney General's limited resources and the limited
19   remedies available to Title III plaintiffs, 'most suits are brought by a small
     number of private plaintiffs who view themselves as champions of the
20   disabled.' " *Betancourt v. Federated Dept. Stores,* 732 F.Supp. 2d 693, 701
21   (W.D.Tex.2010) *quoting Molski v. Evergreen Dynasty Corp.,* 500 F.3d
     1047, 1062 (9th Cir. 2007). (Emphasis supplied.)

22       ADA defendants' strategy is dangerous. ADA defendants are aware of a significant

23   social undercurrent of the hostile skepticism toward ADA plaintiffs. By continuous filing

24   of baseless, scurrilous and  irrelevant documents, many defendants are simply attempting

25   to awaken a potential skepticism in the court.

26       By seeking to arouse cynicism, Defendant artfully attempts to create an intolerable

27   level of distrust between ADA plaintiffs and the Court. If the district court becomes

28

swayed even most slightly, the Defendant benefits but Plaintiff suffers irremediable prejudice. The creation of uncertainty and mutual distrust is Defendant's end game.

The judiciary is the last and the only branch of the government still universally trusted by the public. Defendant's attempts to sow distrust is, on the case level, designed to benefit Defendant and prejudice Plaintiff. On the grander scale it seeks to diminish the trust in the judiciary to that of the executive and legislative.

The judiciary should never permit itself to be so swayed.

### 3. Congressional Definition of "Disability"

Congress declared that one of the purposes of the 2008 ADAAA is "to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's impairment is a disability under the ADA should not demand extensive analysis". *Id.* at §2(B)(5).

The term "disability" is neither a medical nor a vernacular term. It is a term of legal art defined as:

> "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> "(B) a record of such an impairment; or
>
> "(C) being regarded as having such an impairment (as described in paragraph (3)).

*Id.* at §4. The definition of "disability" must be construed in favor of broad coverage "to the maximum extent permitted by this Act". *Id.* §§4(D) and (E) further provide:

> "(D) An impairment that is **episodic** or in **remission** is a disability if it would substantially limit a major life activity when active.
>
> "(E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the **ameliorative effects of mitigating measures** such as—
>
> "(I) **medication**, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), **prosthetics including limbs and devices**, hearing

aids and cochlear implants or other implantable hearing devices, **mobility devices**, or oxygen therapy equipment and supplies;

"(II) use of assistive technology;

"(III) reasonable accommodations or auxiliary aids or services; or

"(IV) learned behavioral or adaptive neurological modifications.

28 C.F.R. 36.105, promulgated at congressional directive, further defines the term "disability". In short, episodic and remissive impairments, e.g., cancer, pleurisy, are to be considered as if active. Ameliorative effects of mitigating measures, e.g. medications such as celecoxib, naproxen and knee prosthesis, cannot be considered in determining whether a person has an impairment. *See Rohr v. Salt River Project Agricultural Improvement and Power District,* 555 F.3d 850, 21 A.D. Cases 964 (9th Cir. 02/13/2009) (Impairments are to be evaluated in their unmitigated state.) *Accord J.D. v. Colonial Williamsburg Foundation,* 18-1725 (4th Cir. 2019) (citing to *Rohr*).

**4. Strojnik Suffers from ADA Impairments Constituting ADA Disability**

Strojnik suffers from following impairments constituting ADA disability:

1. prostate cancer[8] and genitourinary impairment[9]; and
2. renal cancer[10]; and
3. severe right-sided neural foraminal stenosis with symptoms of femoral neuropathy[11]; and
4. degenerative right knee (missing part of limb replaced with prosthesis)[12]; and
5. Substantial limitation on the use of both shoulders, elbows and wrists to reach and twist; and
6. Pleurisy; and
7. Major depressive disorder, bipolar disorder, post-traumatic stress disorder; and
8. Hypertension (200/100); and
9. Record of (1) – (8); and
10. Being regarded as having (1)-(8).

---

[8] Cancer is a disability impairment. 28 CFR 36.105(b)(2)
[9] 28 CFR 36.105(b)(1)(i)
[10] *Id.*
[11] Constitutes ADA disability. *Barlow v. Walgreen* (M.D. Fla. 8:11-cv-71-T-30EA, 2012)
[12] 28 CFR 36.105(d)(2)(iii)(D)

Items (1) and (2) are impairments as a matter of law. (3) has been ameliorated with nerve blocking medication and, when nerve blocking wears of, with prescription and over the counter medications, e.g. celecobix and naproxen. (4) missing right knee is a disability impairment as a matter of law although it has been ameliorated with a prosthesis. (5) is ameliorated with celecobix and naproxen and medical supervision. (6) is episodic with no amelioration. (7) is episodic with no amelioration. (8) is ameliorated with prescription medication, e.g. clonidine HCL.

In their unmitigated state, and when active, these impairments cause excruciating pain and discomfort requiring Strojnik so stay in place or use a wheelchair (as defined in 28 C.F.R. 36.104)[13] and substantially limit him from walking, standing, sitting, bending, sleeping, working, reaching. **NOTE:**

> (v) An impairment is a disability within the meaning of this part if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. **An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting**[14]. (Emphasis supplied)

Strojnik claims disability status under all three prongs of "disability" as defined in the 2008 ADAAA and 28 C.F.R. 36.105. *See* Exhibits 6 and 7, respectively.

**HOW STROJNIK'S ADA DISABILITIES "RELATE"** [15] **TO MAJOR LIFE ACTIVITIES AND BARRIERS TO ACCESSIBILITY**

| DISABILITY | | | | RELATION | |
|---|---|---|---|---|---|
| DESCRIPTION | DISABILITY PRONG | | | MAJOR LIFE ACTIVITY | 28 C.F.R. 36.105 REFERENCE |
| | Impairment | History Of | Reg'ed As | | |
| Prostate Cancer And Genitourinary Impairment | X | X | X | Major Bodily Function (normal cell growth, genitourinary, bladder reproductive) | (c)(1)(ii) (d)(1)(iv) (d)(1) (v) (d)(1) (vi) (d)(1)(viii) (d)(2)((iii)(F) (e)(1)(2) |

---

[13] *Wheelchair* means a manually-operated or power-driven device designed primarily for use by an individual with a mobility disability for the main purpose of indoor or of both indoor and outdoor locomotion.

[14] 28 C.F.R. 105 (d)(v)

[15] .The barrier must "relate" to disability. *Doran v. 7- Eleven, Inc.*, 524 F.3d 1034, 1047 (9th Cir. 2008)

| | | | | | (f)(1) |
|---|---|---|---|---|---|
| Renal Cancer | X | X | X | Major Bodily Function (normal cell growth) | (c)(1)(ii) (d)(1)(iv) (d)(1)(v) (d)(1)(vi) (d)(1)(viii) (d)(2)((iii)(F) (e)(1)(2) (f)(1) |
| Severe Right-Sided Neural Foraminal Stenosis With Symptoms Of Femoral Neuropathy | X | X | X | **Walking, standing, sitting, bending, sleeping, working** | (c)(1)(i) (d)(1)(iv) (d)(1)(v) (d)(1)(vi) (d)(1)(viii) (d)(2)((iii)(D) (e)(1)(2) (f)(1) |
| Degenerative Right Knee | X | X | X | **Walking, standing, sitting, bending, sleeping, working** | (c)(1)(i) (d)(1)(iv) (d)(1)(v) (d)(1)(vi) (d)(1)(viii) (d)(2)((iii)(D) (e)(1)(2) (f)(1) |
| Limitation On The Use Of Both Shoulders, Elbows And Wrists To Reach And Twist | X | X | X | **Performing manual asks, sleeping, reaching, lifting, writing, working** | (c)(1)(i) (d)(1)(iv) (d)(1)(v) (d)(1)(vi) (d)(1)(viii) (e)(1)(2) (f)(1) |
| Pleurisy | X | X | X | **Performing manual asks, sleeping, walking, reaching, lifting, writing, working, breathing** | (c)(1)(i) (d)(1)(iv) (d))1(v) (d)(1)(vi) (d)(2)((iii)(D) (e)(1)(2) (f)(1) |
| As Described in Dr. Lee's 8/1/18 Report | X | X | X | **See Exhibit 8 and Placard, Exhibit 9.** | (c)(1)(i) (e)(1)(2) (f)(1) |

## 4. Evans' Counterclaims for Breach of Contract Cannot be "Harassing" Because Evans *Still* fails to Realize that Strojnik never Visited the Hotel

Evans claims that Strojnik breached the Evans Consulting agreement and the Evans Settlement Agreement, Exhibits 10 and 11 respectively.

The Evans Consulting Agreement provided, in part:

> This letter will confirm that as of October 10, 2018, Peter Strojnik was asked by Evans Hotels, LLC, a hotel management company, to provide the type of accessibility information that a mobility disadvantaged guest may wish to review on a booking website or from an in house booking agent. Strojnik shall be paid a flat fee of $3,000, which shall include Strojnik providing template questionnaires on ADA compliance and consulting with Ms. De Beers regarding such matters.

It is undisputed that Strojnik provided the information. He provided DeBeers with the template questionnaire relating to 302(e)(1)(ii) disclosures and made himself available for additional consultation: In an e-mail exchange with Evans captive counsel, Ms. DeBeers, the latter admitted, *see* Exhibit 12:

On January 9, 2019, Strojnik e-mailed to DeBeers:

> I am not nearly as concerned with the resolution in the Bahia matter as you appear to be. The consulting agreement had been fully performed and the settlement agreement did not release The Lodge at Torrey Pines.

On January 18, 2019, DeBeers Responded:

> The Evans' engagement with you and Strojnik, PC remains both active and incomplete. The scope of your obligations are set forth in the October 10, 2018 engagement letter. **The first paragraph states that you would provide not only template questionnaires on ADA compliance, but also "consulting with Ms. DeBeers" on ADA compliance.** *The latter has not occurred.* Please let me know when you are available for a call, so that you can fulfill your obligations under the engagement letter.
>
> **It appears based on the documents you have sent that you stayed at The Lodge on December 8, 2018.** Your stay violates the non-patronage clause in the settlement agreement that you signed two months before your visit: "Strojnik . . . agrees not to visit, patronize, appear on, call, or otherwise come onto the property of Evans Hotels or any of its corporate affiliates (including The Lodge at Torrey Pines . . . ) for any purpose . . . " and is a clear viola☐on of the settlement agreement. Please note that my client will aggressively defend and pursue all available remedies, including a counterclaim for breach of the consulting agreement and the settlement agreement, including recovery of attorney's fees under the fees clause therein.

Strojnik responded:

> **Indeed, if I had stayed at The Lodge at Torrey Pines that would have been a breach of the agreement for which your client would be entitled to actual damages and I would be entitled to enforce the**

**ADA. But I did not stay there so your client has no contractual claim, but I do have the ADA and Unruh claims.**

**\*\*\***

**I provided you with the template questionnaire as agreed and we consulted regarding it.**

On February 13, 2019, DeBeers emailed:

**I find your statement that you did not stay at The Lodge rather strange, as your cover letter to Mr. Gross states the contrary.**

Thus, it is apparent that DeBeers either never read the letter to Mr. Gross or consciously disregarded it. The letter actually stated, "I *intended* to visit your Hotel on December 8, 2018". Strojnik actually never *visited* the hotel. The Complaint [1] and FAC [2] is based on 28 C.F.R. 36.302(e)(1)(ii) failure to disclose accessibility feature and the "actual knowledge" of disability barriers not from personal observations but from booking website and other sources[16].

Thus, De Beers' reading of the Settlement Agreement that "Strojnik...agrees not to visit, patronize, appear on, call or otherwise come onto the property of Evans Hotels or any of its corporate affiliates (including The Lodge at Torrey Pines, the Bahia Resort Hotel and the Catamaran Resort for any purpose without the prior written consent of Evans confirmed in writing by Evans General Counsel" is completely wrong for the following reasons:

**First,** Strojnik never "visited, patronized, appeared on, called or otherwise came onto the property of ... The Lodge at Torrey Pines".

**Second,** The Lodge at Torrey Pines is neither owned by Evans or any of its affiliates. The Lodge at Torrey Pines is not Evans' "affiliate". It is a property that Evans manages. *See* Exhibit 12, June 9, 2019 e-mail from DeBeers "The Lodge at Torrey Pines [is] one of the properties we manage". *See* excellent discussion of who is and who is not an affiliate referenced in a settlement agreement. *Iqbal v. Ziadeh*, (Cal. App. Dist. 3 3/24/2017) (Exhibit 13)

---

[16] The Complaint was designed to determine the scope of the *CREEC* decision.

11

1  **Third**, Evans would violate 42 U.S.C. §12203 and 28 C.F.R. 36.206 if it denied Strojnik,

2  a disabled individual, lodging there.

3  Consequently, any claim that the lawsuit against Evans was "harassing" is

4  preposterous. What is clear, however, is that Evans' entire breach of contract claim is

5  abuse of process and, once resolved, will subject Evans to a claim for malicious

6  prosecution.

### CONCLUSION AND PRAYER FOR RELIEF

7  The facts are not in dispute and the law is clear. Strojnik is entitled to judgment.

8  DATED this 24th day of March, 2020.

9

10  **PETER STROJNIK**

11

12  Plaintiff

13  Mailed to the Southern District of California this 24th day of March, 2020.

14  And e-mailed to lawyers for Evans.

15  /s/

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 1

**RICHARD GREENFIELD, M.D.**
A MEDICAL CORPORATION
**RAYMOND M. VANCE, M.D.**
A MEDICAL CORPORATION
3737 MORAGA AVENUE, SUITE A108
SAN DIEGO, CALIFORNIA 92117
TELEPHONE (858) 270-4420
FAX (858) 270-8199
___
ORTHOPEDIC SURGERY

March 9, 2020


Klinedinst
Attn: Lindsay N. Casillas, Esq.
801 K Street #1100
Sacramento, CA 95814

                        Re:    STROJNIK, Sr., Peter
                               Vs. Evans Hotel, LLC
                        Case: 3:19-CV-00650-BAS-AGH

Dear Sirs:

Per your request, Peter Strojnik, Sr., was seen for a Medical
Evaluation on 2/20/20.

**HISTORY:** Mr. Strojnik is a 67-year-old gentleman who was seen on
the date of examination. He supplied multiple materials, including
loose-leaf materials and a thumb drive.

He reports that he has cancer of the prostate and genitourinary
problems.

Orthopedically, he has problems with his shoulders, elbows, and
wrists. He indicates those body parts have deteriorated. He says
it is hard for him to reach and it gives him pain at night.    He
has to sleep on his left side. He keeps his right knee at 90° and
the left leg he keeps fully extended.    His left hand is curled
under his chest at night.    He reports he has difficulty raising
both of his arms.    He says it is hard to twist and to turn his
hands.

In regards to the lumbar spine, he says he has restrictions related
to the L5-S1 interval. He says he has seen a neurosurgeon.    He
may have a lot of pain. He will have pain radiating to his right
buttocks into the anterior aspect of the right thigh and the
posterior right calf. He has been treated with nerve blocks and/or
epidurals on three occasions.    The injections have been effective

Re: Strojnik, Sr., Peter            2
March 9, 2020

until recently. He has requested a fourth injection. The first
three injections lasted four to six months. The fourth one has
lasted a little bit less. He said surgery has been discussed with
him. When he is symptomatic, he does not walk. He does not sit.
He has difficulty with stairs. He has difficulty with sleep. He
tries to forward flex to get relief.

He drove to this examination from Arizona. He took three Naprosyn
at 10 a.m. The examination is at noon. He says when things are
bad, he is immobilized.

The next body part involves degeneration of the right knee. On
6/18/19, he had a right total knee replacement with a Stryker
prosthesis. He uses his left leg more than the right. He uses it
as little as possible. He is left leg dominant. He does not use
it as much anymore. He does not feel that he is walking normally.
He is a household ambulator.

He says that is the extent of his orthopedic problems.

**PAST MEDICAL HISTORY**: He denies allergies.

His medicines include the following:
A) Naprosyn.
B) Medicines for hypertension.
C) Pain pill, which he did not take on the day of the examination.
D) Celebrex.

His medical problems include the following:
A) Hypertension.
B) Cancer of the kidney.
C) Depression.

Surgeries have included the following:
A) Right total knee replacement.
B) Resection of renal carcinoma.
C) Prostate surgery.

He smokes cigars.

**REVIEW OF RECORDS**:

1. 6/28/17: Patient provides a list of definitions of disability.

2. He provides the ADA Amendment Act of 2008.

3. MRI of the lumbar spine without contrast performed on 2/20/18
in Phoenix, Arizona. There is mild curvature of the lumbar spine

Re: Strojnik, Sr., Peter                                                    3
    March 9, 2020

and mild disc space narrowing at L2-3 and L5-S1.  Vertebral body
heights are well maintained.  There is no fracture or dislocation.
There is heterogeneous bone marrow signal.  L1-2 is unremarkable.
At L2-3, there is a small bulge and mild bilateral facet
arthropathy.  No central canal or neural foraminal stenosis.  At
L3-4, there is mild bilateral facet arthropathy.  No central canal
or neural foraminal stenosis.  At L4-5, there is a small disc bulge
with mild bilateral facet arthropathy.  No significant central
canal or neural foraminal stenosis.  At L5-S1, there is small to
moderate central and right paracentral disc bulge which appears to
compress the exiting L5 nerve root and results in severe right-
sided neural foraminal stenosis.

4. Marquis Diagnostic Imaging.  CT abdomen without contrast.  This
is for evaluation of the liver, spleen, gallbladder, pancreas,
adrenals, and kidneys.  There is a 4-cm heterogeneous mass in the
left upper pole of the kidney.  Diagnosis: Probable renal cell
carcinoma    left    kidney,    bilateral    renal    cysts,    colonic
diverticulosis,    and    relatively    mild    arterial    vascular
calcifications with no anu-revisited dilatations.

5. Honor Health Body Scan 7/25/18.  There is no evidence of
metastatic disease.  There is increased uptake at the posterior
ninth rib.  There is increased degenerative uptake in the right
knee.

6. There is a disability hearing impaired placard application.

7. Letter from William Romano, M.D., Vascular & Interventional
Physicians.  He is diagnosed with renal cancer and has undergone
several procedures to treat this condition.  His prognosis is
unknown.

8. Total knee replacement.  Brand is Stryker.

9. Visit to Abrazo Arizona Heart Hospital indicates no medications
are documented in regards to a renal mass.

10. Stipulation to change date of physical examination.

11. Disability parking identification from Arizona, permanent.
This states it expires in August of 2018.

12. ADA Disability short course.  Impairment is substantially
limiting the ability of an individual to perform major life
activities as compared to most people in the general population,
also an impairment does not need to prevent or significantly or
severely restrict the individual from performing a major life

Re: Strojnik, Sr., Peter                                                        4
    March 9, 2020

activity to be substantially limiting.   The list includes the
following:
1) Prostate cancer and general urinary impairment.
2) Renal cancer.
3) Severe right-sided neural foraminal stenosis with symptoms of
   femoral neuropathy.
4) Degeneration of the right knee, missing part of the knee,
   replaced with a prosthesis.
5) Substantial limitation of the use of both shoulders, elbows,
   and wrists to reach and twist.
6) Pleurisy.
7) Major depressive disorder, bipolar disorder, posttraumatic
   stress disorder.
8) Hypertension.
9) Record of 1 through 7 being present.

13. Mr. Strojnik's response to ADA Disability questionnaire.  The
focus seems to be on limitations associated with renal cancer,
including excruciating pain while walking, standing, sleeping, or
performing other major life activities.  He is limited in these
activities.  Also mentions right neural foraminal stenosis with
symptoms of femoral neuropathy.  He says the State of Arizona
recognizes him as being disabled.  He also has a degenerative right
knee.  His degenerative right knee limits his activities such as
walking, standing, sleeping, and working.  He also has limitations
in regards to both shoulders, elbows, and wrists to reach and
twist.  Pleurisy is also mentioned.  He would need a wheelchair
when his breathing is impaired due to pleurisy.   There is
continuation of the ADA Disability questionnaire.

14. Relation between Mr. Strojnik's ADA Disability and major life
activities.  It lists prostate cancer and renal cancer.  It states
severe right-sided neural foraminal stenosis with symptoms of
femoral neuropathy with limited walking, standing, sitting,
bending, sleeping, and working.

Degenerative right knee limits walking, standing, sitting,
bending, sleeping, and working.

Limitations on the use of both shoulders, elbows, and wrists to
reach.  Limits in performing manual tasks and limits with reaching,
lifting, writing, and working.

Pleurisy limits him with manual tasks such as sleeping, walking,
reaching, lifting, writing, and working.

**PHYSICAL EXAMINATION:** He is 5'10" and weighs 180 pounds.

Re: Strojnik, Sr., Peter                                    5
    March 9, 2020

On examination of the cervical spine, he is right-hand dominant.
He says his symptomatology is greater on the left than the right.
Head and neck movements are unguarded.  Head and neck are held
erect.  He wears no cervical supports.

He externally rotates his head 45° right and left.  He bends 20°
right and left.  He forward flexes fully 45° and fully extends
40°.

There is no paracervical tenderness.  There is no paracervical
spasm.  Compression/traction tests on the cervical spine are
negative.

On motor examination he presents with a pan weakness in the upper
extremities in a nonanatomic fashion with all motor groups being
4/5 including bilateral shoulder flexors and abductors, elbow
flexors and extensors, wrist flexors and extensors, and first
dorsal interosseous motor groups.

The sensory examination is normal to the upper extremities.

Biceps jerks are symmetrical at 3.  Triceps and brachioradialis
jerks are symmetrical at 2.

Shoulder range of motion shows the patient actively flexing to 90°
bilaterally.  Active abduction is to 30° bilaterally.  Internal
rotation is to 60° bilaterally.  External rotation is to 60°
bilaterally.  Extension is to 35° bilaterally.  Adduction is 0°.

Jamar grip right/left is 30-20-20/35-18-15.  He does not report
any pain on the Jamar grip.

Arm and forearm circumference in this right-hand dominant male is
33/32-cm for the arms and forearm circumference is 27/27-cm.

Elbow range of motion bilaterally is 20 to 125°.  Pronation is 70°
bilaterally.  Supination is 55° bilaterally.

Wrist flexion is 30° bilaterally.  Extension is 20° bilaterally.
Ulnar deviation is 20° bilaterally.  Radial deviation is 10°
bilaterally.  Range of motion is symmetric.

Wrist range of motion is functional as is forearm range of motion
and elbow range of motion.

On examination of the thoracolumbar spine, there is no list.  There
is no lumbar and no thoracic spasm.  Movements are unguarded.  He
has a slight limp.  He has an erect posture.  He has no tenderness.

Re: Strojnik, Sr., Peter                                                6
    March 9, 2020


He has a full range of motion of the thoracolumbar spine with
forward flexion to 90° with reverse of the lumbar curve. Extension
is to 30°. Side bending is to 30° right and left.

Hip range of motion is full, unrestricted, and unguarded with
flexion to 90° bilaterally. Internal rotation is to 15°
bilaterally. External rotation is to 35° bilaterally.

The motor examination is normal to the left lower extremity with
no deficits noted in quadriceps, anterior tibialis, extensor
hallucis longus, peroneal, or gastrocsoleus motor groups.

The motor examination of the right lower extremity shows quadriceps
5/5. Anterior tibialis and extensor hallucis longus are 4/5.
Peroneals and gastrosoleus are 5/5.

He reports a decrease in sensation in the lateral aspect of the
right calf and the dorsal aspect of the right foot.

Knee jerks right/left is 0/4. Ankle jerks are 1/1.

Sitting straight leg raise test is negative. Supine straight leg
raise test is negative.

He does not wish to attempt a heel and toe gait.

Knee circumference right/left is 41.5/41-cm. Thigh circumference
right/left is 44.5/49-cm. Calf circumference right/left is
38.5/39.5-cm.

There is an anterior scar over the right knee. There is side-to-
side pain over either foot.

Left knee active range of motion is 10 to 115° and right knee is
0 to 135°. There is no effusion about either knee. The medial
and lateral collateral ligaments are intact bilaterally. Anterior
drawer tests are negative bilaterally. The right knee will
hyperextend to 5°.

**IMPRESSION:**

1.  Patient report of weakness and loss of function in the
    following:
    A. Shoulders.
    B. Elbows.
    C. Wrists.

Re: Strojnik, Sr., Peter                                                    7
    March 9, 2020

2.  Physical examination of the upper extremities showing the
    following:
    A. A decreased range of motion of the shoulders.
    B. Pan weakness in the upper extremities.
    C. Loss of full extension of the elbows.
3.  Patient-presented complaints of chronic lumbar pain at the
    L5-S1 level with degenerative changes at that level.
4.  Physical findings of the lower back to include the following:
    A. Trace weakness anterior tibial and extensor hallucis
       longus.
    B. Decreased sensation in the lateral right calf and dorsal
       of the right foot.
    C. Absent right knee jerks.
    D. Atrophy of the right thigh.
    E. A limp as he ambulates.
5.  History of right total knee replacement with apparent
    functional right knee post replacement.

**DISCUSSION:** Mr. Strojnik has multiple problems of a non-orthopedic
nature. His orthopedic problems involve complaints involving his
shoulders, elbows, wrists, lower lumbar spine, and the right knee.

He appears to be functioning well post right total knee
arthroplasty. He has some sensory deficits about the right lower
extremity with trace weakness in the anterior tibialis and extensor
hallucis longus.

He has no evidence of positive nerve root tension signs. He
ambulates relatively well with a very slight limp and has an erect
posture. He has a functional range of motion of his shoulders
with flexion, internal rotation, and external rotation. He does
have an initial adequate grip on both the right- and the left-hand
side.

As more materials become available, I would be happy to provide
additional comments.

If I may be of further assistance, please let me know.

                              Yours truly,



                              Richard Greenfield, M.D.

RG:lt

# EXHIBIT 2

1

2

3

4

5                          UNITED STATES DISTRICT COURT

6                          EASTERN DISTRICT OF CALIFORNIA

7

8     Scott Johnson,                          No.   2:19-cv-00103-JAM-DB

9              Plaintiff,

10        v.                                  **ORDER DENYING DEFENDANTS' MOTION TO DISMISS**

11    Alhambra & O Associates, a
      California General
12    Partnership; Chang Haan; and
      Does 1-10,
13
               Defendants.
14

15        Plaintiff Scott Johnson filed a complaint against Defendants

16    Alhambra & O Associates and Chang Haan for alleged violations of

17    the Americans with Disabilities Act ("ADA") and the Unruh Civil

18    Rights Act.  Compl., ECF No. 1.  Plaintiff's complaint invoked

19    the Court's federal question and supplemental jurisdiction.

20    Compl. ¶¶ 11-12 (citing 42 U.S.C. § 1331, 1343(a)(3) & (a)(4)),

21    see also 28 U.S.C. § 1367.  Shortly after, Defendants filed a

22    motion to dismiss under Rule 12(b)(1), arguing Plaintiff lacked

23    standing to sue.  Mot. to Dismiss ("Mot"), ECF No. 8. For the

24    reasons discussed below, the Court DENIES Defendants' Motion to

25    Dismiss.[1]

26    _____

27    [1] This motion was determined to be suitable for decision without
      oral argument.  E.D. Cal. L.R. 230(g).  The hearing was
28    scheduled for May 7, 2019.

                                      1

1      I.   FACTUAL ALLEGATIONS AND PROCEDURAL BACKGROUND

2     Plaintiff is a level C-5 quadriplegic who requires a

3 wheelchair and specially-equipped van for transportation.  Compl.

4 ¶ 1.  In October and December of 2018, Plaintiff visited Alhambra

5 Mail & Parcel ("Alhambra Mail"), "motivated in part to determine

6 if the defendants compl[ied] with the disability access laws."

7 Compl. ¶ 14.  During those visits, Plaintiff identified several

8 features of Alhambra Mail's facility that he believed did not

9 comply with the ADA and Unruh Civil Rights Act.  Compl. ¶¶ 17-31.

10 Plaintiff alleges he encountered each of these barriers and, as a

11 result, was denied full and equal access to the facility.  Compl.

12 ¶¶ 31-32.

13

14                    II.  OPINION

15     A.   Request for Judicial Notice

16     A court may take judicial notice of a fact "that is not

17 subject to reasonable dispute because it is generally known

18 within the trial court's territorial jurisdiction" or "can be

19 accurately and readily determined from sources whose accuracy

20 cannot reasonably be questioned."  Fed. R. Evid. 201(b).

21 Generally, public records maintained on government websites are

22 proper subjects of judicial notice.  Ryan v. City of Lincoln,

23 No. 18-cv-00096-KJM-DB, 2018 WL 6415640 at *2 (E.D. Cal. Dec. 6,

24 2018).  Likewise, a party may seek judicial notice of

25 geographical information from Google Maps if sought to determine

26 the general location of a building or calculate distance.

27 United States v. Perea-Rey, 680 F.3d 1179, 1182 n.1 (9th Cir.

28 2012) (citing Citizens for Peace in Space v. City of Colorado

1 | Sprints, 477 F.3d 1212, 1219 n.2 (10th Cir. 2007).

2 | Defendants request judicial notice of the following:

3 | 1. State Bar of California Attorney Licensee Profile for

4 | Scott Norris Johnson, available at

5 | http://members.calbar.ca.gov/fal/Licensee/Detail/16695 (RJN, Ex.

6 | A);

7 | 2. Disabled Access Prevents Injury, Inc.'s Statement of

8 | Information filed with the California Secretary of State on

9 | December 14, 2015, available at

10 | https://businesssearch.sos.ca.gov/Document/RetrievePDF?Id=030649

11 | 84-20098374 (RJN, Ex. B);

12 | 3. Google Maps navigation showing distance between 5124

13 | Kovanda Avenue, Carmichael, California, and 3104 O Street,

14 | Sacramento, California; available at

15 | https://goo.gl/maps/9DKSDcWmFcK2 (RJN, Ex. C);

16 | 4. Google Maps showing all "copy shops" within

17 | approximately ten miles or less from 5124 Kovanda Avenue,

18 | Carmichael, California, available at

19 | https://goo.gl/maps/MgkoWoqWMHA2 (RJN, Ex. D);

20 | 5. Google Maps Street View image of 5150 Fair Oaks

21 | Boulevard, Carmichael California, available at

22 | https://goo.gl/maps/hNsF1zBvUtM2 (RJN, Ex. E);

23 | 6. UPS Store Carmichael, California Location, providing

24 | the store location's street address, available at

25 | https://locations.theupsstore.com/ca/carmichael/5150-fair-oaks-

26 | blvd (RJN, Ex. F); and

27 | 7. Eastern District CM/ECF Query Results for Plaintiff

28 | Scott Johnson, showing that he has been a plaintiff in 705 cases

1  in the District since July 29, 2013, available at

2  https://ecf.caed.uscourts.gov/cgi-bin/iquery.pl (RJN, Ex. G).

3  Defs.' RJN at 2-4, ECF No. 8-4.

4      The Court agrees that the adjudicative facts Defendants

5  identify are proper subjects of judicial notice.  Defendants'

6  request for judicial notice is, therefore, granted.

7      B.   Legal Standard

8      Article III standing is a prerequisite to suit in the

9  federal courts.  Chapman v. Pier 1 Imports (U.S.), Inc., 631

10  F.3d 939, 946 (9th Cir. 2011).  Because it implicates the

11  court's subject matter jurisdiction, a defendant may challenge

12  standing at any time.  Id., see also Fed. R. Civ. Proc.

13  12(b)(1).  Moreover, "[t]he federal courts are under an

14  independent obligation to examine their own jurisdiction."

15  United States v. Hays, 515 U.S. 737, 742 (1995).

16      The standing inquiry requires a plaintiff to show (1) he

17  suffered an "injury in fact; (2) there is a causal connection

18  between that injury and the defendant's conduct; and (3) a

19  favorable decision would likely redress the injury.  Civil

20  Rights Educ. & Enforce. Ctr. V. Hosp. Properties Trust

21  ("CREEC"), 867 F.3d 1093, 1098 (9th Cir. 2017) (citing Lujan v.

22  Defenders of Wildlife, 504 U.S. 555, 560 (1992)).  When a

23  plaintiff seeks injunctive relief, he must also "allege

24  'continuing, present adverse effects' stemming from the

25  defendant's actions."  Id. (quoting City of Los Angeles v.

26  Lyons, 461 U.S. 95, 102 (1983)).  Federal courts must "take a

27  broad view of constitutional standing in civil rights cases,

28  especially where, as under the ADA, private enforcement suits

4

1    are the primary method of obtaining compliance with the act."

2    Doran v. 7-Eleven, Inc., 524 F.3d 1034, 1039-40 (9th Cir. 2008)

3    (internal quotations omitted).

4         Unlike challenges to a complaint for failure to state a

5    claim, challenges to constitutional standing fall under Federal

6    Rule of Civil Procedure 12(b)(1).  Accordingly, a plaintiff's

7    statement of subject-matter jurisdiction is not governed by the

8    strict pleading standard of Ashcroft v. Iqbal, 556 U.S. 662

9    (2009) and Bell Atlantic Corp. v. Twombly, 550 U.S. 554 (2007).

10   Maya v. Centex Corp., 658 F.3d 1060, 1067 (9th Cir. 2011).  To

11   be sure, "this is not to say that a plaintiff may rely on a bare

12   legal conclusion to assert injury-in-fact, or engage in an

13   ingenious academic exercise in the conceivable to explain how

14   defendants' actions caused his injury."  Id. at 1068 (internal

15   quotations omitted).  But each element of standing need only "be

16   supported . . . with the manner and degree of evidence required

17   at the successive stages of litigation."  Id. (quoting Defenders

18   of Wildlife, 504 U.S. at 561).  Accordingly, the Court must, at

19   this stage, accept as true all material allegations of the

20   complaint and construe those allegations in favor of the

21   complaining party.  Id. (quoting Warth v. Seldin, 422 U.S. 490,

22   501 (1975).

23        C.   Analysis

24             1.   Americans with Disabilities Act

25        Defendants correctly do not challenge whether Plaintiff

26   sufficiently alleged injury in fact, causation, and

27   redressability.  A person with a disability suffers an injury in

28   fact under the ADA "when [he] encounters an accessibility barrier

1   [that] interferes with [his] full and equal enjoyment of the

2   facility.  Chapman, 631 F.3d at 947.  The complaint clearly sets

3   out barriers Plaintiff encountered during his visits to Alhambra

4   Mail.  Compl. ¶¶ 17-31.  Defendants, owners of Alhambra Mail,

5   caused Plaintiff's injury by maintaining a purportedly

6   inaccessible facility.  Compl. ¶¶ 2-10, 14, 17-31.  And

7   injunctive relief would redress the injury Plaintiff now claims.

8   Defendants solely maintain that Plaintiff failed to allege a

9   genuine likelihood of future harm.  Mot. at 2-7.  But as

10  Plaintiff correctly contends, CREEC, 867 F.3d at 1099-1101

11  forecloses this argument.

12      ADA plaintiffs may demonstrate a likelihood of future harm

13  in one of two ways.  They may either show (1) injury in fact

14  coupled with an intent to return to the offending facility; or

15  (2) deterrence from visiting or returning to the facility because

16  of the ADA violation(s).  Id. at 1098-99.  Here, Plaintiff argues

17  that he has shown a likelihood of future harm because Alhambra

18  Mail's ADA violations deter him from returning.  Plf.'s Opp'n to

19  Defs.' Mot. ("Opp'n") at 7-10, ECF No. 12.

20      Allegations of deterrence must be more than hypothetical.

21  Doran, 524 F.3d at 1039; Johnson v. Overlook at Blue Ravine, LLC,

22  ("Blue Ravine"), No. 10-cv-02387-JAM-DAD at *3-4 (E.D. Cal. July

23  20, 2012).  But ADA plaintiffs are not required to be "bona fide

24  patrons."  CREEC, 867 F.3d at 1101.  Plaintiffs may show a

25  likelihood of future harm even if the sole reason for visiting or

26  returning to an establishment is to assess ADA compliance.  Id.

27  Furthermore, an ADA plaintiff need not engage in a "futile

28  gesture to establish Title III standing if she is on notice that

6

1    the establishment does not intend to comply with the ADA" CREEC,

2    867 F.3d at 1101.   Rather, once a plaintiff "has actually become

3    aware of discriminatory conditions existing at a public

4    accommodation . . . . [t]he injury continues so long as

5    equivalent access is denied." Id.

6        Defendants' motion relies primarily on Blue Ravine, 2012 WL

7    2993890 at *3-4. As a preliminary matter, the plaintiff in Blue

8    Ravine, 2012 WL 2993890 at *1 lost on a motion for summary

9    judgment—a stage of litigation that imposes a far greater burden

10   on a plaintiff than the motion-to-dismiss stage.   Moreover, Blue

11   Ravine, 2012 WL 2993890 at *3-4 preceded CREEC, 867 F.3d at 1102,

12   a case where the Ninth Circuit held, as a matter of first

13   impression, that a plaintiff suing under Title III of the ADA

14   could claim tester standing.

15       The Court agrees with Defendants that Plaintiff's tester

16   status, alone, is not enough to confer standing.   See Reply at 3.

17   Likewise, the Court agrees an ADA plaintiff's claimed deterrence

18   must be genuine.   Mot. at 6.   But Defendants' motion makes clear

19   that they construe "genuine" as "unrelated to litigation

20   purposes." See Reply at 3 ("If anything, Plaintiff's new

21   clarification of his intent further undermines the sincerity of

22   any so-called intent [to return].")   This position is

23   irreconcilable with the governing law.   See CREEC, 867 F.3d at

24   1101.   Defendants' repeated efforts to call attention to

25   Plaintiff's motives plainly ignore CREEC's holding that an ADA

26   plaintiff's motivations are irrelevant to the standing inquiry.

27   Id.

28       The Court finds no basis for distinguishing Plaintiff's

7

1   claims of deterrence from those in CREEC, 867 F.3d at 1099–1102.

2   The plaintiffs in CREEC, 867 F.3d at 1099–1101 had never been to

3   the defendant hotels and lacked concrete plans to visit.

4   Nevertheless, the Ninth Circuit found that an absence of concrete

5   plans did not defeat standing.  Id. at 1100-01.  Indeed, the

6   Court found that requiring concrete plans to visit a purportedly

7   inaccessible facility paid short shrift to the settled rule that

8   "a plaintiff need not engage in a futile gesture to establish

9   Title III standing."  CREEC, 867 F.3d at 1101 (internal quotation

10   omitted).  If anything, a lack of concrete plans is even less

11   concerning here.  In CREEC, 867 F.3d at 1098-99 the plaintiffs

12   were suing a real estate investment trust for ADA violations at

13   the trust's hotels.  People generally plan ahead when booking

14   hotel rooms—plans that can often be corroborated with other

15   evidence of a person's intended whereabouts.  But the odds that

16   someone will drop off a package when planned are only as good as

17   their memory that day.  Contrary to what Defendants suggest,

18   Plaintiff did not need to plead corroborating information to

19   bolster his allegation that he is deterred from returning to

20   Alhambra Mail because of the existing barriers.  See Compl. ¶ 38.

21        With these considerations in mind, the Court finds Plaintiff

22   adequately alleged deterrence.  Defendants' motion to dismiss

23   Plaintiff's ADA claim for lack of subject-matter jurisdiction is

24   DENIED.

25             2.   Unruh Civil Rights Act

26        The Unruh Civil Rights Act permits an ADA plaintiff to

27   recover money damages if he prevails on his ADA claim.  Cal. Civ.

28   Code § 51(f).  As pleaded, Plaintiff's Unruh Civil Rights claim

1  is wholly derivative of his ADA claim.  His standing under the

2  Unruh Civil Rights Act is, therefore, one in the same with his

3  ADA standing.  Defendants' motion to dismiss Plaintiff's Unruh

4  Civil Rights claim for lack of subject-matter jurisdiction is

5  DENIED.

6

7                        III.   ORDER

8       For the reasons set forth above, the Court DENIES

9  Defendants' Motion to Dismiss.

10      IT IS SO ORDERED.

11  Dated: June 21, 2019

12

13                                        JOHN A. MENDEZ,
                                          UNITED STATES DISTRICT JUDGE

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT 3

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PETER STROJNIK, SR., | Case No. 1:18-cv-01620-AWI-SKO |
| Plaintiff, | **FINDINGS AND RECOMMENDATIONS THAT PLAINTIFF'S MOTION FOR DEFAULT JUDGMENT BE GRANTED IN PART** |
| v. | |
| THE VICTUS GROUP, INC., d/b/a Sierra Sky Ranch | (Doc. 11) |
| Defendant. | **OBJECTIONS DUE: 21 DAYS** |

## I.   INTRODUCTION

On May 31, 2019, Plaintiff Peter Strojnik, Sr. filed a motion for default judgment[1] against Defendant The Victus Group, Inc. d/b/a Sierra Sky Ranch. (Doc. 11.) No opposition to Plaintiff's motion was filed.   The Court has reviewed the motion and supporting documentation and determined that the matter was suitable for decision without oral argument pursuant to Local Rule 230(g).   As such, the motion was deemed submitted on the papers and no hearing was scheduled.

For the reasons set forth below, the Court RECOMMENDS that Plaintiff's motion for

---

[1] Plaintiff filed two copies of the motion in the same document. (*See generally* Doc. 11.) Plaintiff also filed a third copy of the motion on June 6, 2019. (Doc. 13.) Thus, the Court will consider only the first copy of the motion, (Doc. 11 at 1 –15, 31–32), as Plaintiff's motion for default judgment.

1   default judgment be GRANTED IN PART and that Plaintiff be awarded the sum of $4,447.

2   **II.   FACTUAL BACKGROUND**

3        On November 8, 2018, Plaintiff filed a complaint alleging claims for negligence and

4   violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*; the

5   California Unruh Act, California Civil Code § 51 *et seq.*; and the California Disabled Persons Act

6   ("CDPA"), California Civil Code § 54 *et seq*. (Doc. 1.) The complaint seeks an award of statutory,

7   compensatory and punitive damages, costs of suit, and injunctive relief.[2]  *Id.*  Plaintiff alleges that

8   he "walks with difficulty and pain and requires compliant mobility accessible features," and uses

9   a wheelchair, (*Id.* ¶¶ 4, 14), and the property that is the subject of this suit, Sierra Sky Ranch ("the

10   Property") presents numerous barriers that interfere with his ability to use and enjoy the goods,

11   services, privileges, and accommodations offered at the facility (*Id.* ¶ 10).

12        Defendant was served with the complaint on March 20, 2019. (Doc. 5.) To date, Defendant

13   has not responded to the complaint.

14        Plaintiff requested that the Clerk enter default against Defendants on May 13, 2019, (Doc.

15   7), which was entered on May 15, 2019. (Doc. 8.) On May 31, 2019, Plaintiff filed a motion for

16   default judgment against Defendant, which is currently pending before the Court. (Doc. 11.)

17        On June 3, 2019, the Court entered a minute order directing Defendant to file its response

18   in opposition to the motion by no later than July 15, 2019, and allowing Plaintiff to file an optional

19   reply brief by no later July 29, 2019. (Doc. 12.) The Court directed Plaintiff to file proof of service

20   of the minute order on Defendant by June 15, 2019. (*Id.*) Plaintiff filed proof of service on June

21   18, 2019, stating that he served the minute order on Defendant's registered agent on June 13, 2019.

22   (Doc. 14.) Defendant has not filed a response in opposition to the motion and no other pleadings

23   were filed by the July 29, 2019 deadline.

24   **III.   DISCUSSION**

25   **A.   Legal Standard**

26        Federal Rule of Civil Procedure 55(b) permits a court-ordered default judgment following

27

28   [2] The complaint also requests attorney's fees. (*See, e.g.,* Doc. 1 at 4.) Plaintiff is not entitled to attorney's fees since he is proceeding pro se, and Plaintiff clarifies in his motion for default judgment that he is not requesting attorney's fees. (Doc. 11 at 12.)

1   the entry of default by the clerk of the court under Rule 55(a). It is within the sole discretion of

2   the court as to whether default judgment should be entered. *See Aldabe v. Aldabe*, 616 F.2d 1089,

3   1092 (9th Cir. 1980). A defendant's default by itself does not entitle a plaintiff to a court-ordered

4   judgment. *See id.* Instead, the Ninth Circuit has determined a court should consider seven

5   discretionary factors, often referred to as the "*Eitel* factors," before rendering a decision on default

6   judgment. *See Eitel v. McCool*, 782 F.2d 1470, 1471-72 (9th Cir. 1986). The *Eitel* factors include

7   (1) the possibility of prejudice to the plaintiff, (2) the merits of the plaintiff's substantive claim,

8   (3) the sufficiency of the complaint, (4) the sum of money at stake in the action, (5) the possibility

9   of a dispute concerning material facts, (6) whether the default was due to excusable neglect, and

10  (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the

11  merits. *See id.*

12       A plaintiff is required to prove all damages sought in the complaint. *See Televideo Sys.,*

13  *Inc. v. Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1992). In addition, any relief sought may not

14  be different in kind from, or exceed in amount, what is demanded in the complaint. Fed. R. Civ.

15  P. 54(c). If the facts necessary to determine the damages are not contained in the complaint, or

16  are legally insufficient, they will not be established by default. *See Cripps v. Life Ins. Co. of N.*

17  *Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992).

18       Finally, once the court clerk enters a default, the well-pleaded factual allegations of the

19  complaint are taken as true, except for those allegations relating to damages. *See Televideo Sys.,*

20  *Inc.*, 826 F.2d at 917.

21  **B.    Analysis**

22       **1.    The *Eitel* Factors Weigh in Favor of Granting a Default Judgment**

23            **a.    Prejudice to Plaintiff if Default Judgment is Not Granted**

24       If default judgment is not entered, Plaintiff will effectively be denied a remedy until

25  Defendant participates and makes an appearance in the litigation – which may never occur.

26  Denying Plaintiff a means of recourse is, by itself, sufficient to meet the burden imposed by this

27  factor. *See, e.g., Philip Morris, USA, Inc. v. Castworld Prods., Inc.*, 219 F.R.D. 494, 499 (C.D.

28  Cal. 2003).

### b.    Merits of Plaintiff's Substantive Claims and the Sufficiency of the Complaint

The next relevant *Eitel* factors include an evaluation of the merits of the substantive claims pled in the complaint as well as the general sufficiency of the complaint. In weighing these factors, courts evaluate whether the complaint is sufficient to state a claim that supports the relief sought. *See Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978); *see also DIRECTV, Inc. v. Huynh*, 503 F.3d 847, 854 (9th Cir. 2007) ("[A] defendant is not held to admit facts that are not well-pleaded or to admit conclusions of law.") (internal quotation marks omitted).

### 1.    Title III of the ADA

Title III of the ADA provides that "[n]o individual shall be discriminated against on the basis of disability" in places of public accommodation. 42 U.S.C. § 12182(a). "Discrimination" is defined as a failure to remove "barriers . . . where such removal is readily achievable." *Id.* at § 12182(b)(2)(A)(iv); *see also Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 945 (9th Cir. 2011) (en banc). Where a barrier's removal is not "readily achievable," a public accommodation must make its facilities available through "alternative methods if such methods are readily achievable." 42 U.S.C. § 12182(b)(2)(A)(v).

"To prevail on a Title III discrimination claim, the plaintiff must show that (1) [he or she] is disabled within the meaning of the ADA; (2) the defendant is a private entity that owns, leases, or operates a place of public accommodation; and (3) the plaintiff was denied public accommodations by the defendant because of her [or his] disability." *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (9th Cir. 2007). Further, "[t]o succeed on an ADA claim of discrimination on account of one's disability due to an architectural barrier, the plaintiff must also prove that: (1) the existing facility at the defendant's place of business presents an architectural barrier prohibited under the ADA, and (2) the removal of the barrier is readily achievable." *Parr v. L & L Drive-Inn Rest.*, 96 F. Supp. 2d 1065, 1085 (D. Haw. 2000).

According to the complaint, Plaintiff suffers from physical impairments which "substantially limit his major life activities," "walks with difficulty and pain and requires

4

1   compliant mobility accessible features," and uses a wheelchair, and is thus "physically disabled"

2   as defined by the applicable California and federal laws.  (Doc. 1 ¶¶ 3–4, 14.)  As a hotel, the

3   Property is a facility of public accommodation.  (*Id.* ¶ 5.)  Plaintiff alleges that Defendant owns,

4   operates, or leases the Property; thus, it is allegedly liable for the Property's noncompliance with

5   the ADA.  (*Id.*)

6         Plaintiff does not allege in the complaint that he visited the Property himself.  (*See*

7   *generally id.*)[3]  Instead, Plaintiff alleges he intended to visit the Property but Defendant's booking

8   website failed to describe accessibility features in sufficient detail and failed to make reservations

9   for accessible guest rooms available, which deterred Plaintiff from visiting the Property.  (*Id.* ¶¶

10  11, 19–20.)  The complaint alleges Plaintiff intends to visit the Property in the future when the

11  Property becomes fully compliant with the ADA.  (*Id.* ¶ 12.)  Plaintiff alleges his review of the

12  booking website and photographs of the Property made him aware of specific accessibility barriers

13  at the Property that are in violation of the ADA.  (*Id.* ¶¶ 21–22, 24.)  Plaintiff describes the

14  architectural accessibility barriers in an addendum to the complaint.  (*See id.* at 24–28.)

15        Plaintiff alleges that Defendant failed to provide barrier-free access to the Property in the

16  following ways: (1) the booking website does not identify and describe accessibility features in

17  sufficient detail, or make reservations for accessible guest rooms available, in violation of 28

18  C.F.R. § 36.302(e); and (2) the following parts of the Property are inaccessible for Plaintiff as an

19  individual who is mobility-limited and uses a wheelchair: (a) the pool; (b) the parking lot; (c) the

20  entry door; (d) the check-in-counter; (e) handrails throughout the Property (configured in an

21  inaccessible manner); (f) the bar in the lobby; (g) the bathrooms; and (h) the mattresses and beds.

22  (*See id.*)  Plaintiff alleges these aspects of Defendant's property are inaccessible to him because

23  he uses a wheelchair and otherwise has limited mobility.  (*Id.* ¶ 14.)

24        Plaintiff's allegations that he was deterred from visiting the Property based on knowledge

25  of noncompliance with the ADA, and that he plans to visit the Property once it becomes ADA-

26  compliant, are sufficient to establish standing under the ADA.  *See Civil Rights Education and*

---

27
28  [3] Plaintiff contends in the motion for default judgment that he "subsequently visited the hotel to independently verify that it was, at least on the outside, suitable to accommodate his disability, and discovered that the hotel was replete with numerous accessibility barriers."  (Doc. 34 at 3.)

5

1   *Enforcement Center v. Hospitality Properties Trust*, 867 F.3d 1093, 1099–1100 (9th Cir. 2017).

2   Plaintiff further alleges that the removal of the accessibility barriers described above is "readily

3   achievable." (Doc. 1 ¶ 26.)     As these facts are taken as true regarding Defendant following its

4   entry of default, Plaintiff has met his burden of stating a *prima facie* Title III discrimination claim.

5               **2.    Unruh Act and CDPA**

6          Pursuant to the Unruh Civil Rights Act, all persons are "entitled to the full and equal

7   accommodations, advantages, facilities, privileges, or services in all business establishments of

8   every kind whatsoever." Cal Civ. Code, § 51(b). Additionally, no business establishment of any

9   kind whatsoever shall discriminate against any person in California on account of disability.

10   Cal. Civ. Code, § 51.5. The Unruh Act and CDPA both incorporate an individual's rights under

11   the ADA by reference, such that a violation of the ADA also constitutes a violation of the Unruh

12   Civil Rights Act and the CDPA. Cal. Civ. Code, §§ 51(f), 54.1(d).

13          Here, Plaintiff alleges that Defendants denied him full and equal accommodations,

14   advantages, facilities, privileges and services in a business establishment based on his disability.

15   (Doc. 1 ¶¶ 10, 24.) For purposes of pleading his claims, Plaintiff incorporates his prior allegations

16   regarding the barriers he encountered at the Property, (*Id.* ¶¶ 28, 41), and alleges that Defendant

17   denied Plaintiff "equal access to its public accommodation on the basis of his disability as outlined

18   above." (*Id.* ¶¶ 36, 42.)

19          Although substantially boilerplate, these claims are sufficiently pled. *See Loskot v. D & K*

20   *Spirits, LLC,* No. 2:10-cv-0684-WBS-DAD, 2011 WL 567364 at \*3 (E.D. Cal. Feb. 15, 2011)

21   (noting that, although "plaintiff's complaint is largely boilerplate, it is sufficient to support the

22   requested relief" under the ADA for purposes of default judgment); *see also Gutierrez v. Leng*,

23   No. 1:14-CV-01027-WBS, 2015 WL 1498813, at \*4 (E.D. Cal. Mar. 31, 2015) (same). Further,

24   because Plaintiff's complaint properly alleges a prima facie claim under the ADA, Plaintiff has

25   also properly alleged facts establishing the necessary elements for an Unruh Civil Rights Act claim

26   and a CDPA claim. *See Brooke v. C & S Chong Investment Corporation*, No. 1:17-cv-01583-

27   LJO-JLT, 2018 WL 1704628, at \*4 ("Because Plaintiff alleges a cognizable ADA claim, she has

28   also established the defendant is liable for violating the Unruh Act [and] the California Disabled

1   Persons Act.").

2   ### 3.   Negligence

3   Under California law, negligence is presumed[4] if the plaintiff establishes the following

4   elements: "(1) the defendant violated a statute of a public entity; (2) the violation was the proximate

5   cause of the plaintiff's injury; (3) the injury resulted from an occurrence the nature of which the

6   statute was designed to prevent; and (4) the plaintiff suffering the injury was among the class of

7   persons for whose protection the statute was adopted." *Saylor v. Zeenat, Inc.*, No. Civ.S02-

8   863WBS/DAD, at *2 (E.D. Cal. Aug. 13, 2002) (citing *Galvez v. Fields*, 88 Cal.App.4th 1410,

9   1420 (2001)).

10   Here, Plaintiff has sufficiently alleged that Defendant violated the ADA; the violation

11   proximately caused Plaintiff to be deterred from visiting the Property; the injury is one the ADA

12   was designed to prevent; and Plaintiff, as a disabled person, is among the class of persons for

13   whose protection the ADA was adopted. *See Saylor v. Zeenat, Inc.*, No. Civ.S02-863-WBS/DAD,

14   2002 WL 33928621, at *2 (E.D. Cal. Aug. 13, 2002).

15   The complaint sufficiently states Plaintiff's claims under Title III of the ADA, the Unruh

16   Civil Rights Act, the CDPA, and negligence per se, and there appears to be merit to the substantive

17   allegations. As such, these *Eitel* factors weigh in favor of default judgment.

18   ### c.   Sum of Money at Stake

19   The fourth *Eitel* factor, the sum of money at stake, weighs in favor of granting default

20   judgment. Default judgment is disfavored when a large amount of money is involved or is

21   unreasonable in light of the defendant's actions. *See Truong Giang Corp. v. Twinstar Tea Corp.*,

22   No. C 06-03594-JSW, 2007 WL 1545173 at *12 (N.D. Cal. May 29, 2007). Here, Plaintiff's

23   complaint seeks costs in the amount of $447, and statutory damages under the Unruh Act and

24   CDPA in the amount of $4,000 and $1,000 per encounter, respectively. Plaintiff's motion for

25   default judgment, however, seeks $32,000 in statutory damages and $15,000 in punitive damages.

26   (Doc. 11 at 10.)

27

28   ---

[4] The Court construes Plaintiff's claim as a claim for negligence per se based on violations of the ADA, as the Ninth
Circuit has directed that district courts liberally construe pro se pleadings. *Eldridge v. Block*, 832 F.2d 1132, 1137
(9th Cir. 1987).

7

1    As set forth below, the Court concludes that Plaintiff has not proved any damages beyond

2  the statutory minimum under the Unruh Act of $4,000, which is not a relatively significant amount

3  of money, and thus this factor weighs in favor of granting default judgment.

4         **d.      Dispute Concerning Material Facts**

5    With regard to this factor, no genuine issues of material fact are likely to exist because the

6  allegations in the complaint are taken as true, *Televideo Sys.*, 826 F.2d at 917-18, and Defendants

7  have submitted nothing to contradict the well-pled allegations in the complaint.  Accordingly, this

8  factor favors entry of default judgment.

9         **e.      Default Due to Excusable Neglect**

10    Defendants failed to file responsive pleadings or oppose Plaintiff's motion for default

11  judgment.  The Court has no evidence before it establishing that Defendants' failure to participate

12  in the litigation is due to excusable neglect.  Thus, this factor weighs in favor of granting default

13  judgment.

14         **f.      Strong Policy Favoring Decision on the Merits**

15    This factor inherently weighs strongly against awarding default judgment in every case.  In

16  the aggregate, however, this factor is outweighed in consideration of the other applicable factors

17  that weigh in favor of granting default judgment.

18       **2.      Terms of the Judgment and Proof of Damages**

19    While analysis of the *Eitel* factors supports a default judgment, the Court also considers

20  the proof of the damages and the terms of the judgment sought by Plaintiff.

21         **a.      Injunctive Relief**

22    Plaintiff's complaint and motion for default judgment seek an injunction requiring

23  Defendants to make several changes and accommodations at the Property.  (*See, e.g.,* Doc. 1 at

24  11–28)[5].  As the factual allegations in the Complaint are taken as true, Plaintiff is entitled to

25

26

---

27  [5] Although the changes requested by Plaintiff are not a model of clarity, construed liberally, they can be summarized
as requesting that the Property change certain aspects of its layout to become accessible to him as an individual who

28  is mobility-limited and uses a wheelchair.  Because Defendant failed to respond to the complaint, Plaintiff's factual
allegations are taken as true. *See Televideo Sys., Inc.*, 826 F.2d at 917.

8

injunctive relief as requested pursuant to both state and federal law.[6] *See Wander v. Kaus*, 304
F.3d 856, 858 (9th Cir. 2002) ("Damages are not recoverable under Title III of the ADA – only
injunctive relief is available for violations of Title III.").

### b.   Damages

The Unruh Civil Rights Act provides for, among other things, a minimum statutory
damages amount of $4,000 per violation.  Cal. Civ. Code § 52(a); *Grove v. De La Cruz*, 407 F.
Supp. 2d 1126, 1133 (C.D. Cal. 2005) (the Unruh Act "provides for statutory damages up to a
maximum of three times the actual damages but no less than $4,000 for each instance of
discrimination").  A violation of the ADA constitutes a violation of the Unruh Act.  As such,
Plaintiff asserts that he is entitled to at least $4,000 in statutory damages. (Doc. 1 ¶ 40(e).) Plaintiff
also asserts that he is entitled to at least $1,000 in statutory damages under the CDPA.  (*Id.* ¶ 46(e).)

Plaintiff has sufficiently alleged facts indicating that he experienced one encounter of
barriers at the Property that interfered with his ability to use and enjoy the goods, services,
privileges, and accommodations offered at the Property (his review of the booking website that
deterred him from visiting the Property).  Thus, Plaintiff is entitled to an award of $4,000 in
statutory damages.  Plaintiff cannot recover under both the Unruh Act and the CDPA, however.
*See Rodriguez v. Barrita, Inc.*, 10 F. Supp. 3d 1062, 1074 (N.D. Cal. Jan. 3, 2014) (citing *Munson
v. Del Taco, Inc.*, 46 Cal.4th 661, 632 (2009)).

The Court further recommends that punitive damages are inappropriate, and Plaintiff has
not proved any damages separate from, or in addition to, the minimum statutory damages he is
entitled to under the Unruh Act.  *See Peters v. CJK Associates, LLC*, No. Civ.S 03 1388 LJJ/KJ,
2003 WL 24205920, at *3 (E.D. Cal. Oct. 29, 2003) (in action claiming negligence and violations
of ADA, Unruh Act, and CDPA, finding that as a matter of law, plaintiff was not entitled to
punitive damages in addition to Unruh Act statutory damages); *Doran v. Embassy Suites Hotel*,
No. C-02-1961 EDL, 2002 WL 1968166, at *4 (N.D. Cal. Aug. 26, 2002) (same); *see also*

---

[6] Plaintiff also requests the Court order "closure" of Sierra Sky Ranch until Defendant fully complies with the Unruh
Act. (Doc. 1 ¶ 40(e).) Plaintiff has provided no legal authority, and the Court can find no legal authority, for ordering
Defendant to cease operations at Sierra Sky Ranch until coming into compliance with the Unruh Act, and the Court
recommends that this request be denied.

1  *Televideo Sys., Inc. v. Heidenthal*, 826 F.2d at 917–18.

2         **c.**     **Attorney's Fees and Costs of Litigation**

3         Pursuant to 42 U.S.C. § 12205, a party that prevails on claims brought under the ADA may

4  recover reasonable attorney's fees and costs, in the court's discretion. California Civil Code, § 55,

5  also provides for attorney's fees and costs for obtaining injunctive relief; section 54.3 provides

6  fees for recovery of damages to enforce the "full and equal access" guaranteed to disabled persons

7  by Section 54.1. Here, however, Plaintiff is proceeding *pro se* and is not entitled to attorney's

8  fees. Plaintiff requests $447 in costs and expenses in filing the lawsuit, which the Court finds

9  reasonable.

10                   **IV.**   **RECOMMENDATION**

11         Based on consideration of the motion for default judgment, (Doc. 11), and the complaint,

12  (Doc. 1), the Court RECOMMENDS that:

13        1.     Plaintiff's motion for default judgment be GRANTED IN PART as specified below;

14        2.     Judgment be entered in Plaintiff's favor and against Defendant the Victus Group,
15              Inc. d/b/a Sierra Sky Ranch;

16        3.     Defendant be found and declared to be in violation of Title III of the Americans with
17              Disabilities Act;

18        4.     Plaintiff be awarded statutory damages under the Unruh Act in the amount of $4,000;

19        5.     Plaintiff be awarded reasonable costs of suit in the amount of $447; and

20        6.     Defendant be ordered to make the following modifications to the Property known as
21              Sierra Sky Ranch, located at 50552 Rd 632 in Oakhurst, California, such that each
22              item is brought into compliance with the accessibility requirements of the Americans
23              with Disabilities Act and California Code of Regulations, Title 24:

24              a.     The booking website shall be changed to identify and describe accessibility
25                   features in sufficient detail, and make reservations for accessible guest rooms
26                   available, in compliance with 28 C.F.R. § 36.302(e); and

27              b.     The pool, parking lot, entry door, check-in-counter, handrails, bar in the
28                   lobby, bathrooms, walkways, and mattresses and beds shall be made and

1           maintained in a condition that is ADA-complaint and accessible to

2           individuals who are mobility-limited and use a wheelchair.

3       Furthermore, Plaintiff is HEREBY ORDERED to mail a copy of these findings and

4   recommendations to Defendant at Defendant's last known address.

5       These findings and recommendations are submitted to the district judge assigned to this

6   action, pursuant to 28 U.S.C. § 636(b)(1)(B) and this Court's Local Rule 304.  Within twenty-one

7   (21) days of service of this recommendation, any party may file written objections to these findings

8   and recommendations with the Court and serve a copy on all parties.  Such a document should be

9   captioned "Objections to Magistrate Judge's Findings and Recommendations."  The district judge

10   will review the magistrate judge's findings and recommendations pursuant to 28 U.S.C.

11   § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may

12   waive the right to appeal the district judge's order.  *Wilkerson v. Wheeler*, 772 F.3d 834, 839 (9th

13   Cir. 2014).

14

15   IT IS SO ORDERED.

16   Dated:   **September 9, 2019**                    /s/ *Sheila K. Oberto*

17                                     UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28

**EXHIBIT 4**

United States District Court
Northern District of California

1

2

3

4                        UNITED STATES DISTRICT COURT

5                       NORTHERN DISTRICT OF CALIFORNIA

6

7    PETER STROJNIK (Sr.),                    Case No.  19-cv-03583-JSC

8              Plaintiff,

9        v.                                   **ORDER RE: MOTION TO DISMISS**

10   GF CARNEROS TENANT, LLC dba              Re: Dkt. No. 20
     CARNEROS RESORT AND SPA,

11             Defendant.

12

13        Peter Strojnik brings this action for injunctive relief and monetary damages against GF

14   Carneros Tenant, LLC dba Carneros Resort and Spa.[1]  Mr. Strojnik alleges (1) a violation of the

15   Americans with Disabilities Act ("ADA"); (2) violation of California's Unruh Act, Cal. Civ. Code

16   §§51-52; (3) violation of the California Disabled Persons Act, Cal. Civ. Code §§ 54-54.3

17   ("DPA"); and (4) a negligence claim.  Now pending before the Court is Carneros Resort's motion

18   to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). After consideration of the parties'

19   briefing and having had the benefit of oral argument on November 7, 2019, the Court DENIES

20   Carneros Resort's motion to dismiss as Mr. Strojnik has sufficiently pled that he has standing to

21   bring this suit.

22                                   **BACKGROUND**

23        **A. Complaint Allegations**

24        Mr. Strojnik is a disabled person as defined by the ADA. (Complaint at ¶¶ 2, 11.)[2] In

25   particular, Mr. Strojnik is "legally disabled by virtue of a severe right-sided neural foraminal

26   stenosis with symptoms of femoral neuropathy, prostate cancer and renal cancer" and

27   ─────────────
     [1] All parties have consented to the jurisdiction of a magistrate judge pursuant to 28 U.S.C. §
     636(c). (Dkt. Nos. 7 and 15.)
28   [2] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the
     ECF-generated page numbers at the top of the documents.

United States District Court
Northern District of California

1   "degenerative right knee." (*Id.* at ¶ 3.) Mr. Strojnik planned to visit "California Wine Country"

2   and on or around April 18, 2019 reviewed hotel booking websites. (*Id.* at ¶ 15 and pp. 13, 16, 17,

3   18.) When perusing third-party booking websites, such websites "failed to identify and describe

4   mobility related accessibility features and guest rooms offered through its reservations service in

5   enough detail to reasonably permit Plaintiff to assess independently whether Defendant's Hotel

6   meets his accessibility needs." (*Id.* at ¶ 17.) In addition, the third-party sites "failed to make

7   reservations for accessible guest rooms available in the same manner as individuals who do not

8   need accessible rooms." (*Id.* at ¶ 18.) Mr. Strojnik alleges the same issues with information

9   related to accessibility when he accessed Carneros Resort's first party booking website. (*Id.* at ¶

10  19, 20.) He also relied on online information and photos on the third-party website and Carneros

11  Resort's website to conclude that the hotel has barriers to accessibility. (*Id.* at ¶ 21, 22.) Because

12  the violations "relate to Plaintiff's disability and interfere with Plaintiff's full and complete

13  enjoyment of the hotel," he opted to book a room at a different hotel. (*Id.* at ¶ 24-25.) Carneros

14  Resort's "failure to remove accessibility barriers prevented Plaintiff from equal access to the

15  Defendant's public accommodation." (*Id.* at ¶ 27.) Included in Mr. Strojnik's complaint are

16  photos and descriptions of various barriers to access taken of Carneros Resort. (*Id.* at 18-33.)

**B. Procedural Background**

17          Mr. Strojnik filed the Complaint against Carneros Resort on June 20, 2019, alleging

18  violations of (1) the ADA, (2) the Unruh Act, (3) the California Disabled Persons Act, and (4)

19  negligence based on Carneros Resort's failure to accommodate his disability.

20          In his initial complaint, Mr. Strojnik did not properly name the Defendant, and thus, filed a

21  First Amended Complaint on August 13, 2019 (Dkt No. 1; No. 9.) Carneros Resort answered the

22  First Amended Complaint on September 20, 2019 and a week later filed the underlying motion to

23  dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).

24  (Dkt. Nos. 13; 20.) The motion is fully briefed.

**LEGAL STANDARD**

25          Pursuant to Rule 12(b)(1), a district court must dismiss an action if it lacks jurisdiction

26  over the subject matter of the suit. *See* Fed. R. Civ. P. 12(b)(1). "A party invoking federal

27  jurisdiction has the burden of establishing that it has satisfied the 'case-or-controversy'

28

2

United States District Court
Northern District of California

1    requirement of Article III of the Constitution [and] standing is a 'core component' of that

2    requirement." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). "The doctrine of

3    standing asks whether a litigant is entitled to have a federal court resolve his grievance." *Kowalski*

4    *v. Tesmer*, 543 U.S. 125, 128 (2004). "[T]he Supreme Court has instructed [the court] to take a

5    broad view of constitutional standing in civil rights cases, especially where, as under the ADA,

6    private enforcement suits are the primary method of obtaining compliance with the act." *Doran v.*

7    *7-Eleven, Inc.,* F.3d 1034, 1039 (9th Cir. 2008) (internal quotation marks omitted).

8                                                    **DISCUSSION**

9          Carneros Resort moves to dismiss for lack of subject matter jurisdiction insisting that Mr.

10   Strojnik does not have standing.  The standing analysis considers whether the plaintiff has

11   demonstrated (1) an injury in fact that is (a) concrete and particularized and (b) actual or

12   imminent; (2) causation; and (3) a likelihood that a favorable decision will redress the injury.

13   *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560 (1992).  Carneros Resort makes a facial attack

14   on Mr. Strojnik's complaint as it is not challenging the truth of the complaint's allegations, but

15   instead argues that the allegations are "insufficient on their face to invoke federal jurisdiction."

16   *Safe Air for Everyone v. Meyer,* 373 F.3d 1035, 1039 (9th Cir. 2004) (internal quotation marks

17   omitted). As such, allegations of the complaint are taken as true and construed in the light most

18   favorable to the complaining party. *Levine v. Vilsack,* 587 F.3d 986, 991 (9th Cir. 2009).

19         Carneros Resort contends that Mr. Strojnik's allegations do not satisfy the injury-in-fact

20   requirement. Its argument is defeated by *Civil Rights Education and Enforcement Center v.*

21   *Hospitality Properties Trust,* 867 F.3d 1093, 1098-1099 (9th Cir. 2017).  There, the Ninth Circuit

22   held in an ADA access case:

> The Named Plaintiffs have alleged in the First Amended Complaint
> that they intend to visit the relevant hotels, but have been deterred
> from doing so by the hotels' noncompliance with the ADA. They
> further allege that they will visit the hotels when the non-compliance
> is cured. Thus, the ADA violations have prevented them from staying
> at the hotels. Without such averments, they would lack standing.
> However, "construing the factual allegations in the complaint in favor
> of the plaintiffs," as we must at this preliminary stage, we conclude
> that the Named Plaintiffs have sufficiently alleged injury in fact. Their
> harm is "concrete and particularized," and their intent to visit the
> hotels once they provide equivalent shuttle service for the disabled
> renders their harm "actual or imminent, not conjectural or
> hypothetical."

3

*Civil Rights Educ. & Enf't Ctr. v. Hosp. Properties Tr.*, 867 F.3d 1093, 1099 (9th Cir. 2017). Here, as described above, Mr. Strojnik similarly alleges that he intends to visit the defendant hotel but has been deterred from doing so by what he alleges constitutes the hotel's noncompliance with the ADA. He also alleges that he will visit the hotel when the non-compliance is cured. Plaintiff has therefore alleged standing sufficient to withstand a facial standing attack.

Carneros Resort nonetheless insists that Mr. Strojnik cannot demonstrate an injury because Mr. Strojnik has not demonstrated a genuine intent to return to the hotel. Its argument, however, requires the Court to disregard the Ninth Circuit's command that it accept Plaintiff's allegations as true. *Civil Rights Educ. & Enf't Ctr.*, 867 F.3d at 1099. If Carneros Resort was making a factual attack on standing the Court would not have to accept Mr. Strojnik's factual allegations. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). But Carneros Resort's motion is a facial attack on standing on which the Court is required to draw all reasonable inferences from the alleged facts in Mr. Strojnik's favor.

At oral argument Carneros Resort also appeared to argue that Mr. Strojnik had not encountered or been made aware of any ADA violations. But to accept this argument the Court would again have to violate the directive that it construe the allegations of the complaint in Mr. Strojnik's favor. He specifically alleges the online reservation systems failed to identify the hotel's accessibility and contends that this omission is an ADA violation. He also identifies what he contends are other barriers to access. At this stage, Carneros Resort has not proved that drawing all factual inferences in Mr. Strojnik's favor, he has not sufficiently alleged that he became aware of accessibility barriers.

## CONCLUSION

For the reasons stated above, the Court DENIES Carneros Resort's motion to dismiss. This Order disposes of Docket No. 20.

**IT IS SO ORDERED.**

Dated: November 13, 2019

JACQUELINE SCOTT CORLEY
United States Magistrate Judge

# EXHIBIT 5



**PETER STROJNIK**

2375 EAST CAMELBACK ROAD
SUITE 600
PHOENIX, ARIZONA 85016
TELEPHONE: 602-524-6602
E-MAIL PS@STROJNIK.COM

December 21, 2018

Bill Gross – bgross@lodgetorreypines.com
Torrey Pines Club Corporation dba The Lodge At Torrey Pines
11480 N Torrey Pines Rd, La Jolla, CA 92037

Re: *Courtesy Notice of Potential Litigation*

Dear Mr. Gross:

I am a disabled veteran and an ADA tester. I intended to visit your Hotel on December 8, 2018. During my booking procedure I noted that the Hotel does not provide equal access as required by 28 CFR §36.302(e), and during my stay there I noted that it does not comply with the 2010 Standards of Accessibility Design or California's Unruh and DPA.

In the preparation of the attached draft Complaint, I gathered information from third party booking agent's website and other third party websites. This information may be old and not reliable; therefore, let me know any corrections that should be incorporated into the draft Complaint. Further, please review the attached 2010 Standards for Accessibility Design and, pursuant to 28 CFR §36.302(e), disclose which of the mobility requirements have not been met.

I strongly suggest you consult with an attorney learned in ADA issues. This is a complex matter involving significant potential damages, attorney's fees, costs and expenses to you.

I request that you respond to this communication no later than Friday, January 10, 2019. If this time is insufficient to review the matter thoroughly, please let me know. In the meantime, I am able to discuss this matter with you or your counsel by phone and e-mail.

Sincerely,

Peter Strojnik

Encls. as indicated

# EXHIBIT 6



Español | Other Languages

CONNECT WITH US   

Home    About EEOC    Employees & Applicants    Employers / Small Business

Federal Agencies    Contact Us

---

Laws, Regulations, Guidance & MOUs

Overview

Laws

Regulations

Guidance

Memoranda of Understanding

Discrimination by Type

Prohibited Practices

---

Home > Laws, Regulations & Guidance > Statutes

# ADA AMENDMENTS ACT OF 2008

**PL 110-325 (S 3406)**
**September 25, 2008**

An Act To restore the intent and protections of the Americans with Disabilities Act of 1990.

Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,

*[42 USCA § 12101 note]*

## SEC. 1. SHORT TITLE

This Act may be cited as the "ADA Amendments Act of 2008".

*[42 USCA § 12101 note]*

## SEC. 2. FINDINGS AND PURPOSES

(a) FINDINGS. -- Congress finds that --

(1) in enacting the Americans with Disabilities Act of 1990 (ADA), Congress intended that the Act "provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities" and provide broad coverage;

(2) in enacting the ADA, Congress recognized that physical and mental disabilities in no way diminish a person's right to fully participate in all aspects of society, but that people with physical or mental disabilities are frequently precluded from doing so because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers;

(3) while Congress expected that the definition of disability under the ADA would be interpreted consistently with how courts had applied the definition of a handicapped individual under the Rehabilitation Act of 1973, that expectation has not been fulfilled;

(4) the holdings of the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases have narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect;

Americans with Disabilities Act Amendments Act of 2008

(5) the holding of the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) further narrowed the broad scope of protection intended to be afforded by the ADA;

(6) as a result of these Supreme Court cases, lower courts have incorrectly found in individual cases that people with a range of substantially limiting impairments are not people with disabilities;

(7) in particular, the Supreme Court, in the case of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), interpreted the term "substantially limits" to require a greater degree of limitation than was intended by Congress; and

(8) Congress finds that the current Equal Employment Opportunity Commission ADA regulations defining the term "substantially limits" as "significantly restricted" are inconsistent with congressional intent, by expressing too high a standard.

(b) PURPOSES. – The purposes of this Act are—

(1) to carry out the ADA's objectives of providing "a clear and comprehensive national mandate for the elimination of discrimination" and "clear, strong, consistent, enforceable standards addressing discrimination" by reinstating a broad scope of protection to be available under the ADA;

(2) to reject the requirement enunciated by the Supreme Court in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures;

(3) to reject the Supreme Court's reasoning in Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999) with regard to coverage under the third prong of the definition of disability and to reinstate the reasoning of the Supreme Court in School Board of Nassau County v. Arline, 480 U.S. 273 (1987) which set forth a broad view of the third prong of the definition of handicap under the Rehabilitation Act of 1973;

(4) to reject the standards enunciated by the Supreme Court in Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002), that the terms "substantially" and "major" in the definition of disability under the ADA "need to be interpreted strictly to create a demanding standard for qualifying as disabled," and that to be substantially limited in performing a major life activity under the ADA "an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives";

(5) to convey congressional intent that the standard created by the Supreme Court in the case of Toyota Motor Manufacturing, Kentucky, Inc. v. Williams, 534 U.S. 184 (2002) for "substantially limits", and applied by lower courts in numerous decisions, has created an inappropriately high level of limitation necessary to obtain coverage under the ADA, to convey that it is the intent of Congress that the primary object of attention in cases brought under the ADA should be whether entities covered under the ADA have complied with their obligations, and to convey that the question of whether an individual's

impairment is a disability under the ADA should not demand extensive analysis; and

(6) to express Congress' expectation that the Equal Employment Opportunity Commission will revise that portion of its current regulations that defines the term "substantially limits" as "significantly restricted" to be consistent with this Act, including the amendments made by this Act.

## SEC. 3. CODIFIED FINDINGS.

Section 2(a) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12101) is amended—

(1) by amending paragraph (1) to read as follows: "(1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination;";

(2) by striking paragraph (7); and

(3) by redesignating paragraphs (8) and (9) as paragraphs (7) and (8), respectively.

## SEC. 4. DISABILITY DEFINED AND RULES OF CONSTRUCTION.

(a) DEFINITION OF DISABILITY.—Section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102) is amended to read as follows:

"SEC. 3. DEFINITION OF DISABILITY.

"As used in this Act:

"(1) DISABILITY.—The term 'disability' means, with respect to an individual—

"(A) a physical or mental impairment that substantially limits one or more major life activities of such individual;

"(B) a record of such an impairment; or

"(C) being regarded as having such an impairment (as described in paragraph (3)).

"(2) MAJOR LIFE ACTIVITIES.—

"(A) IN GENERAL.—For purposes of paragraph (1), major life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

"(B) MAJOR BODILY FUNCTIONS.—For purposes of paragraph (1), a major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions.

"(3) REGARDED AS HAVING SUCH AN IMPAIRMENT.—For purposes of paragraph (1)(C):

"(A) An individual meets the requirement of 'being regarded as having such an impairment' if the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity.

"(B) Paragraph (1)(C) shall not apply to impairments that are transitory and minor. A transitory impairment is an impairment with an actual or expected duration of 6 months or less.

"(4) RULES OF CONSTRUCTION REGARDING THE DEFINITION OF DISABILITY.—The definition of 'disability' in paragraph (1) shall be construed in accordance with the following:

"(A) The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.

"(B) The term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.

"(C) An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.

"(D) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

"(E)(i) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures such as—

"(I) medication, medical supplies, equipment, or appliances, low-vision devices (which do not include ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aids and cochlear implants or other implantable hearing devices, mobility devices, or oxygen therapy equipment and supplies;

"(II) use of assistive technology;

"(III) reasonable accommodations or auxiliary aids or services; or

"(IV) learned behavioral or adaptive neurological modifications.

"(ii) The ameliorative effects of the mitigating measures of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity.

"(iii) As used in this subparagraph—

"(I) the term 'ordinary eyeglasses or contact lenses' means lenses that are intended to fully correct visual acuity or eliminate refractive error; and

"(II) the term 'low-vision devices' means devices that magnify, enhance, or otherwise augment a visual image.".

(b) CONFORMING AMENDMENT.—The Americans with Disabilities Act of 1990 (42 U.S.C. 12101 et seq.) is further amended by adding after section 3 the following:

"SEC. 4. ADDITIONAL DEFINITIONS.

"As used in this Act:

"(1) AUXILIARY AIDS AND SERVICES.—The term 'auxiliary aids and services' includes—

"(A) qualified interpreters or other effective methods of making aurally delivered materials available to individuals with hearing impairments;

"(B) qualified readers, taped texts, or other effective methods of making visually delivered materials available to individuals with visual impairments;

"(C) acquisition or modification of equipment or devices; and

"(D) other similar services and actions.

"(2) STATE.—The term 'State' means each of the several States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the Virgin Islands of the United States, the Trust Territory of the Pacific Islands, and the Commonwealth of the Northern Mariana Islands."

(c) AMENDMENT TO THE TABLE OF CONTENTS.—The table of contents contained in section 1(b) of the Americans with Disabilities Act of 1990 is amended by striking the item relating to section 3 and inserting the following items:

"Sec. 3. Definition of disability.

"Sec. 4. Additional definitions.".

# SEC. 5. DISCRIMINATION ON THE BASIS OF DISABILITY.

(a) ON THE BASIS OF DISABILITY.—Section 102 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12112) is amended—

(1) in subsection (a), by striking "with a disability because of the disability of such individual" and inserting "on the basis of disability"; and

(2) in subsection (b) in the matter preceding paragraph (1), by striking "discriminate" and inserting "discriminate against a qualified individual on the basis of disability".

(b) QUALIFICATION STANDARDS AND TESTS RELATED TO UNCORRECTED VISION.—Section 103 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12113) is amended by redesignating subsections (c) and (d) as subsections (d) and (e), respectively, and inserting after subsection (b) the following new subsection:

"(c) QUALIFICATION STANDARDS AND TESTS RELATED TO UNCORRECTED VISION.—Notwithstanding section 3(4)(E)(ii), a covered entity shall not use qualification standards, employment tests, or other selection criteria based on an individual's uncorrected vision unless the standard, test, or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and consistent with business necessity."

(c) CONFORMING AMENDMENTS.—

(1) Section 101(8) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111(8)) is amended—

(A) in the paragraph heading, by striking "WITH A DISABILITY"; and

(B) by striking "with a disability" after "individual" both places it appears.

(2) Section 104(a) of the Americans with Disabilities Act of 1990 (42 U.S.C. 12114(a)) is amended by striking "the term 'qualified individual with a disability' shall" and inserting "a qualified individual with a disability shall".

# SEC. 6. RULES OF CONSTRUCTION.

(a) Title V of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201 et seq.) is amended —

(1) by adding at the end of section 501 the following:

"(e) BENEFITS UNDER STATE WORKER'S COMPENSATION LAWS.—Nothing in this Act alters the standards for determining eligibility for benefits under State worker's compensation laws or under State and Federal disability benefit programs.

"(f) FUNDAMENTAL ALTERATION.—Nothing in this Act alters the provision of section 302(b)(2)(A)(ii), specifying that reasonable modifications in policies, practices, or procedures shall be required, unless an entity can demonstrate that making such modifications in policies, practices, or procedures, including academic requirements in postsecondary education, would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations involved.

"(g) CLAIMS OF NO DISABILITY.—Nothing in this Act shall provide the basis for a claim by an individual without a disability

that the individual was subject to discrimination because of the individual's lack of disability.

"(h) REASONABLE ACCOMMODATIONS AND MODIFICATIONS.—A covered entity under title I, a public entity under title II, and any person who owns, leases (or leases to), or operates a place of public accommodation under title III, need not provide a reasonable accommodation or a reasonable modification to policies, practices, or procedures to an individual who meets the definition of disability in section 3(1) solely under subparagraph (C) of such section.";

(2) by redesignating section 506 through 514 as sections 507 through 515, respectively, and adding after section 505 the following:

"SEC. 506. RULE OF CONSTRUCTION REGARDING REGULATORY AUTHORITY.
"The authority to issue regulations granted to the Equal Employment Opportunity Commission, the Attorney General, and the Secretary of Transportation under this Act includes the authority to issue regulations implementing the definitions of disability in section 3 (including rules of construction) and the definitions in section 4, consistent with the ADA Amendments Act of 2008."; and

(3) in section 511 (as redesignated by paragraph (2)) (42 U.S.C. 12211), in subsection (c), by striking "511(b)(3)" and inserting "512(b)(3)".

(b) The table of contents contained in section 1(b) of the Americans with Disabilities Act of 1990 is amended by redesignating the items relating to sections 506 through 514 as the items relating to sections 507 through 515, respectively, and by inserting after the item relating to section 505 the following new item:

"Sec. 506. Rule of construction regarding regulatory authority."

## SEC. 7. CONFORMING AMENDMENTS.

Section 7 of the Rehabilitation Act of 1973 (29 U.S.C. 705) is amended—

(1) in paragraph (9)(B), by striking "a physical" and all that follows through "major life activities", and inserting "the meaning given it in section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102)"; and

(2) in paragraph (20)(B), by striking "any person who" and all that follows through the period at the end, and inserting "any person who has a disability as defined in section 3 of the Americans with Disabilities Act of 1990 (42 U.S.C. 12102).".

*[29 USCA § 705 note]*

## SEC. 8. EFFECTIVE DATE

This Act and the amendments made by this Act shall become effective on January 1, 2009.

Approved September 25, 2008.

CONNECT WITH US

Privacy Policy | Disclaimer | USA.Gov

# EXHIBIT 7

*Video remote interpreting (VRI) service* means an interpreting service that uses video conference technology over dedicated lines or wireless technology offering high-speed, wide-bandwidth video connection that delivers high-quality video images as provided in §36.303(f).

*Wheelchair* means a manually-operated or power-driven device designed primarily for use by an individual with a mobility disability for the main purpose of indoor or of both indoor and outdoor locomotion. This definition does not apply to Federal wilderness areas; wheelchairs in such areas are defined in section 508(c)(2) of the ADA, 42 U.S.C. 12207(c)(2).

[Order No. 1513-91, 56 FR 35592, July 26, 1991, as amended by AG Order No. 3181-2010, 75 FR 56250, Sept. 15, 2010; 76 FR 13287, Mar. 11, 2011; AG Order 3702-2016, 81 FR 53240, Aug. 11, 2016]

⭡ Back to Top

### §36.105  Definition of "disability."

(a)(1) *Disability* means, with respect to an individual:

(i) A physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(ii) A record of such an impairment; or

(iii) Being regarded as having such an impairment as described in paragraph (f) of this section.

(2) *Rules of construction.* (i) The definition of "disability" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA.

(ii) An individual may establish coverage under any one or more of the three prongs of the definition of "disability" in paragraph (a)(1) of this section, the "actual disability" prong in paragraph (a)(1)(i) of this section, the "record of" prong in paragraph (a)(1)(ii) of this section, or the "regarded as" prong in paragraph (a)(1)(iii) of this section.

(iii) Where an individual is not challenging a public accommodation's failure to provide reasonable modifications under §36.302, it is generally unnecessary to proceed under the "actual disability" or "record of" prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. In these cases, the evaluation of coverage can be made solely under the "regarded as" prong of the definition of "disability," which does not require a showing of an impairment that substantially limits a major life activity or a record of such an impairment. An individual may choose, however, to proceed under the "actual disability" or "record of" prong regardless of whether the individual is challenging a public accommodation's failure to provide reasonable modifications.

(b)(1) *Physical or mental impairment* means:

(i) Any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as: Neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine; or

(ii) Any mental or psychological disorder such as intellectual disability, organic brain syndrome, emotional or mental illness, and specific learning disability.

(2) *Physical or mental impairment* includes, but is not limited to, contagious and noncontagious diseases and conditions such as the following: Orthopedic, visual, speech and hearing impairments, and cerebral palsy, epilepsy, muscular dystrophy, multiple sclerosis, cancer, heart disease, diabetes, intellectual disability, emotional illness, dyslexia and other specific learning disabilities, Attention Deficit Hyperactivity Disorder, Human Immunodeficiency Virus infection (whether symptomatic or asymptomatic), tuberculosis, drug addiction, and alcoholism.

(3) *Physical or mental impairment* does not include homosexuality or bisexuality.

(c)(1) *Major life activities* include, but are not limited to:

(i) Caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, writing, communicating, interacting with others, and working; and

(ii) The operation of a *major bodily function,* such as the functions of the immune system, special sense organs and skin, normal cell growth, and digestive, genitourinary, bowel, bladder, neurological, brain, respiratory, circulatory, cardiovascular, endocrine, hemic, lymphatic, musculoskeletal, and reproductive systems. The operation of a major bodily function includes the operation of an individual organ within a body system.

(2) *Rules of construction.* (i) In determining whether an impairment substantially limits a major life activity, the term *major* shall not be interpreted strictly to create a demanding standard.

(ii) Whether an activity is a *major life activity* is not determined by reference to whether it is of *central* importance to daily life.

(d) *Substantially limits—*(1) *Rules of construction.* The following rules of construction apply when determining whether an impairment substantially limits an individual in a major life activity.

(i) The term "substantially limits" shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA. "Substantially limits" is not meant to be a demanding standard.

(ii) The primary object of attention in cases brought under title III of the ADA should be whether public accommodations have complied with their obligations and whether discrimination has occurred, not the extent to which an individual's impairment substantially limits a major life activity. Accordingly, the threshold issue of whether an impairment substantially limits a major life activity should not demand extensive analysis.

(iii) An impairment that substantially limits one major life activity does not need to limit other major life activities in order to be considered a substantially limiting impairment.

(iv) An impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active.

(v) An impairment is a disability within the meaning of this part if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment does not need to prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting. Nonetheless, not every impairment will constitute a disability within the meaning of this section.

(vi) The determination of whether an impairment substantially limits a major life activity requires an individualized assessment. However, in making this assessment, the term "substantially limits" shall be interpreted and applied to require a degree of functional limitation that is lower than the standard for substantially limits applied prior to the ADA Amendments Act.

(vii) The comparison of an individual's performance of a major life activity to the performance of the same major life activity by most people in the general population usually will not require scientific, medical, or statistical evidence. Nothing in this paragraph (d)(1) is intended, however, to prohibit or limit the presentation of scientific, medical, or statistical evidence in making such a comparison where appropriate.

(viii) The determination of whether an impairment substantially limits a major life activity shall be made without regard to the ameliorative effects of mitigating measures. However, the ameliorative effects of ordinary eyeglasses or contact lenses shall be considered in determining whether an impairment substantially limits a major life activity. Ordinary eyeglasses or contact lenses are lenses that are intended to fully correct visual acuity or to eliminate refractive error.

(ix) The six-month "transitory" part of the "transitory and minor" exception in paragraph (f)(2) of this section does not apply to the "actual disability" or "record of" prongs of the definition of "disability." The effects of an impairment lasting or expected to last less than six months can be substantially limiting within the meaning of this section for establishing an actual disability or a record of a disability.

(2) *Predictable assessments.* (i) The principles set forth in the rules of construction in this section are intended to provide for more generous coverage and application of the ADA's prohibition on discrimination through a framework that is predictable, consistent, and workable for all individuals and entities with rights and responsibilities under the ADA.

(ii) Applying these principles, the individualized assessment of some types of impairments will, in virtually all cases, result in a determination of coverage under paragraph (a)(1)(i) of this section (the "actual disability" prong) or paragraph (a)(1)(ii) of this section (the "record of" prong). Given their inherent nature, these types of impairments will, as a factual matter, virtually always be found to impose a substantial limitation on a major life activity. Therefore, with respect to these types of impairments, the necessary individualized assessment should be particularly simple and straightforward.

(iii) For example, applying these principles it should easily be concluded that the types of impairments set forth in paragraphs (d)(2)(iii)(A) through (K) of this section will, at a minimum, substantially limit the major life activities indicated. The types of impairments described in this paragraph may substantially limit additional major life activities (including major bodily functions) not explicitly listed in paragraphs (d)(2)(iii)(A) through (K).

(A) Deafness substantially limits hearing;

(B) Blindness substantially limits seeing;

(C) Intellectual disability substantially limits brain function;

(D) Partially or completely missing limbs or mobility impairments requiring the use of a wheelchair substantially limit musculoskeletal function;

(E) Autism substantially limits brain function;

(F) Cancer substantially limits normal cell growth;

(G) Cerebral palsy substantially limits brain function;

(H) Diabetes substantially limits endocrine function;

(I) Epilepsy, muscular dystrophy, and multiple sclerosis each substantially limits neurological function;

(J) Human Immunodeficiency Virus (HIV) infection substantially limits immune function; and

(K) Major depressive disorder, bipolar disorder, post-traumatic stress disorder, traumatic brain injury, obsessive compulsive disorder, and schizophrenia each substantially limits brain function.

(3) *Condition, manner, or duration.* (i) At all times taking into account the principles set forth in the rules of construction, in determining whether an individual is substantially limited in a major life activity, it may be useful in appropriate cases to consider, as compared to most people in the general population, the conditions under which the individual performs the major life activity; the manner in which the individual performs the major life activity; or the duration of time it takes the individual to perform the major life activity, or for which the individual can perform the major life activity.

(ii) Consideration of facts such as condition, manner, or duration may include, among other things, consideration of the difficulty, effort or time required to perform a major life activity; pain experienced when performing a major life activity; the length of time a major life activity can be performed; or the way an impairment affects the operation of a major bodily function. In addition, the non-ameliorative effects of mitigating measures, such as negative side effects of medication or burdens associated with following a particular treatment regimen, may be considered when determining whether an individual's impairment substantially limits a major life activity.

(iii) In determining whether an individual has a disability under the "actual disability" or "record of" prongs of the definition of "disability," the focus is on how a major life activity is substantially limited, and not on what outcomes an individual can achieve. For example, someone with a learning disability may achieve a high level of academic success, but may nevertheless be substantially limited in one or more major life activities, including, but not limited to, reading, writing, speaking, or learning because of the additional time or effort he or she must spend to read, write, speak, or learn compared to most people in the general population.

(iv) Given the rules of construction set forth in this section, it may often be unnecessary to conduct an analysis involving most or all of the facts related to condition, manner, or duration. This is particularly true with respect to impairments such as those described in paragraph (d)(2)(iii) of this section, which by their inherent nature should be easily found to impose a substantial limitation on a major life activity, and for which the individualized assessment should be particularly simple and straightforward.

(4) *Mitigating measures* include, but are not limited to:

(i) Medication, medical supplies, equipment, appliances, low-vision devices (defined as devices that magnify, enhance, or otherwise augment a visual image, but not including ordinary eyeglasses or contact lenses), prosthetics including limbs and devices, hearing aid(s) and cochlear implant(s) or other implantable hearing devices, mobility devices, and oxygen therapy equipment and supplies;

(ii) Use of assistive technology;

(iii) Reasonable modifications or auxiliary aids or services as defined in this regulation;

(iv) Learned behavioral or adaptive neurological modifications; or

(v) Psychotherapy, behavioral therapy, or physical therapy.

(e) *Has a record of such an impairment.* (1) An individual has a record of such an impairment if the individual has a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.

(2) *Broad construction.* Whether an individual has a record of an impairment that substantially limited a major life activity shall be construed broadly to the maximum extent permitted by the ADA and should not demand extensive analysis. An individual will be considered to fall within this prong of the definition of "disability" if the individual has a history of an impairment that substantially limited one or more major life activities when compared to most people in the general population, or was misclassified as having had such an impairment. In determining whether an impairment substantially limited a major life activity, the principles articulated in paragraph (d)(1) of this section apply.

(3) *Reasonable modification.* An individual with a record of a substantially limiting impairment may be entitled to a reasonable modification if needed and related to the past disability.

(f) *Is regarded as having such an impairment.* The following principles apply under the "regarded as" prong of the definition of "disability" (paragraph (a)(1)(iii) of this section):

(1) Except as set forth in paragraph (f)(2) of this section, an individual is "regarded as having such an impairment" if the individual is subjected to a prohibited action because of an actual or perceived physical or mental impairment, whether or not that impairment substantially limits, or is perceived to substantially limit, a major life activity, even if the public accommodation asserts, or may or does ultimately establish, a defense to the action prohibited by the ADA.

(2) An individual is not "regarded as having such an impairment" if the public accommodation demonstrates that the impairment is, objectively, both "transitory" and "minor." A public accommodation may not defeat "regarded as" coverage of an individual simply by demonstrating that it subjectively believed the impairment was transitory and minor; rather, the public accommodation must demonstrate that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment), objectively, both "transitory" and "minor." For purposes of this section, "transitory" is defined as lasting or expected to last six months or less.

(3) Establishing that an individual is "regarded as having such an impairment" does not, by itself, establish liability. Liability is established under title III of the ADA only when an individual proves that a public accommodation discriminated on the basis of disability within the meaning of title III of the ADA, 42 U.S.C. 12181-12189.

(g) *Exclusions.* The term "disability" does not include—

(1) Transvestism, transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not resulting from physical impairments, or other sexual behavior disorders;

(2) Compulsive gambling, kleptomania, or pyromania; or

(3) Psychoactive substance use disorders resulting from current illegal use of drugs.

[AG Order 3702-2016, 81 FR 53240, Aug. 11, 2016]

⬆ Back to Top

**§§36.106-36.199   [Reserved]**

⬆ Back to Top

## Subpart B—General Requirements

⬆ Back to Top

**§36.201   General.**

(a) *Prohibition of discrimination.* No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any private entity who owns, leases (or leases to), or operates a place of public accommodation.

(b) *Landlord and tenant responsibilities.* Both the landlord who owns the building that houses a place of public accommodation and the tenant who owns or operates the place of public accommodation are public accommodations subject to the requirements of this part. As between the parties, allocation of responsibility for complying with the obligations of this part may be determined by lease or other contract.

(c) *Claims of no disability.* Nothing in this part shall provide the basis for a claim that an individual without a disability was subject to discrimination because of a lack of disability, including a claim that an individual with a disability was granted a reasonable modification that was denied to an individual without a disability.

[Order No. 1513-91, 56 FR 35592, July 26, 1991, as amended by AG Order 3702-2016, 81 FR 53243, Aug. 11, 2016]

**EXHIBIT 8**



**ADOT**
Motor Vehicle Division
96-0104 R07/13    www.azdot.gov

Mail Drop 801Z
Special Plates Unit
Motor Vehicle Division
PO Box 2100
Phoenix AZ 85001-2100

# DISABILITY – HEARING IMPAIRED PLATE/PLACARD APPLICATION

Application Type: ☐ New Plate  ☐ New Placard
For renewals, use form # 40-0112, available online.

| Applicant Name (disabled/hearing impaired person or organization) | Phone | Date of Birth | Driver License Number |
|---|---|---|---|
| Strojnik, Peter | ( ) | 6-15-52 | |

| Applicant Mailing Address | City | State | Zip |
|---|---|---|---|
| | | | |

**Plate Applicants:** Vehicle Information below is for plate applicants only (vehicle must be owned or leased by the disabled/hearing impaired person)

| Vehicle Identification Number | Year | Make | Current Plate Number |
|---|---|---|---|
| | | | |

**Physically Disabled** — International Symbol of Access, for parking in specially marked spaces
Medical Certification must be completed by an authorized physician (doctor of medicine, osteopathy, podiatry or chiropractic, licensed to practice medicine in the United States), a registered nurse practitioner or by a hospital administrator. Applicant must have one or more of the following conditions.

**— Visual Impairment in and of itself does not qualify a person for a plate or placard. —**
- Unable to walk 200 feet without stopping to rest
- Unable to walk without help from another person or a brace, cane, crutch, wheelchair or other prosthetic or assistive device
- Lung disease with forced respiratory, expiratory volume for one second, if measured by spirometry, is less than one liter, or the arterial oxygen tension is less than 60 mm/hg on room air at rest
- Uses portable oxygen
- Cardiac condition with Class 3 or 4 functional limitations as by American Heart Association standards
- Severely limited in ability to walk due to an arthritic, neurological or orthopedic condition

**Hearing Impaired** — To alert law enforcement and others to the driver's condition (not for special parking privileges)
Medical Certification must be completed by a person licensed to practice medicine in the United States or an audiologist certified by the American Speech, Language and Hearing Association. Applicant must be unable to hear or understand normal speech, with or without a hearing aid, in optimal conditions.

## Medical Certification

| Health Professional Name * | Phone | Fax |
|---|---|---|
| Marc Lee  M.D. | ( 602 251 3122 | ( 602 254 1226 |

| Hospital Name (If signed by Administrator) | | |
|---|---|---|
| | | |

| Mailing Address | City | State | Zip |
|---|---|---|---|
| 1301 E McDowell Rd # 202 | Phx | Az | 85006 |

I certify that the applicant has one or more of the conditions listed above and for that reason is:
☑ **Permanently Physically Disabled** .  ☐ **Temporarily** Physically Disabled (must be recertified after 6 months)  ☐ Hearing Impaired

| Health Professional Signature (stamp not accepted) * | Medical License or Certification Number | Date |
|---|---|---|
| Marc Lee MD | AZ 9292 | 8/1/18 |

* Must be authorized physician (see above), registered nurse practitioner, audiologist or hospital administrator. Stamp Not Accepted

## Individual Applicants

I certify (or declare) that the foregoing is true and correct. I have read the front and back of this form and I fully understand and take responsibility for the use of the Disability Placard(s) or Plates that are issued to me.
The Medical Certification above was not completed because:
☐ One is already on file for the following plate/placard
☐ Authorized from another state (indicate plate/placard number and state)

| | Plate/Placard Number | State |
|---|---|---|
| | | |

| Applicant Signature (disabled/hearing impaired person) | Date |
|---|---|
| | |

## Organization Applicants

I certify (or declare) that the foregoing is true and correct. I have read the front and back of this form and I fully understand and take responsibility for the use of the Disability Placard(s) or Plates that are issued to this organization.
☐ The vehicle indicated above is primarily used to transport physically disabled persons who have one or more of the conditions listed above.
☐ The Nonprofit Organization/Applicant indicated above provides assistance to senior citizens.

| Authorized Officer Name | Officer Signature | Date |
|---|---|---|
| | | |

| MVD Use | Plate # Issued | Placard # Issued | MVD Agent | Office | Issue Date |
|---|---|---|---|---|---|
| **Non-Profit Organization** | | Placard # Issued | Placard # Issued | Placard # Issued | |

**EXHIBIT 9**

Remove from mirror
before operating vehicle

40-4308 R01/18
azdot.gov



**Motor Vehicle Division**

Disability Parking Identification

ARIZONA



# 5C4958

EXPIRES LAST DAY OF:

| JAN | FEB | MAR | APR | MAY | JUN |
|-----|-----|-----|-----|-----|-----|
| JUL | AUG | SEP | OCT | NOV | DEC |
| 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 |



Remove from mirror
before operating vehicle

40-4308 R07/16
www.azdot.gov



**Motor Vehicle Division**

Disability Parking Identification

ARIZONA



# 0504X8

EXPIRES LAST DAY OF:

| 8 | 18 |
|---|----|
| TH | |

# EXHIBIT 10



October 10, 2018

***VIA ELECTRONIC MAIL (ps@strojnik.com)***

Peter Strojnik
STROJNIK, P.C.
2375 East Camelback Road Suite 600
Phoenix, Arizona 85016
Telephone: 602-524-6602

***Re: Engagement Letter***

Dear Sir:

This letter will confirm that as of October 10, 2018, Peter Strojnik was asked by Evans Hotels, LLC, a hotel management company, to provide the type of accessibility information that a mobility disadvantaged guest may wish to review on a booking website or from an in house booking agent. Strojnik shall be paid a flat fee of $3,000, which shall include Strojnik providing template questionnaires on ADA compliance and consulting with Ms. De Beers regarding such matters.

Strojnik acknowledges that it will receive access to confidential information in connection with this representation. Strojnik shall take all appropriate and necessary steps to assure that the Evans' Entities' proprietary information is protected within and outside of the office. Strojnik's staff is taught, and periodically reminded, to protect confidential information.

Under this engagement, all communications between the Evans Entities and Strojnik, including communications between Strojnik and Ms. De Beers, shall be for the sole purpose of assisting Strojnik in performing the services under this agreement. Strojnik will not disclose to anyone, without the Evans Entities' written permission, the nature or content of any oral or written communication, nor any information gained from the inspection of any record(s) or document(s) submitted to Strojnik, including information obtained from corporate records or documents, and Strojnik will not permit inspection of any papers or documents without our prior written permission. As part of Strojnik's engagement, Strojnik will immediately notify the Evans Entities of the happening of any one of the following events: (a) the exhibition or surrender of any documents or records submitted to Strojnik or someone under Strojnik's direction, in a manner not expressly authorized by the Evans Entities; (b) a request by anyone to examine, inspect, or copy such documents or records; (c) any attempt to serve, or the actual service of any court order, subpoena, or summons requiring the production of any such documents or records. Strojnik will immediately return all documents, records or work papers to us at our request.

Peter Strojnik
October 10, 2018
Page 2



Please sign below and return this original letter to me to indicate your agreement and understanding of the terms of your engagement.

We look forward to working with you.  Thank you

Sincerely,

Julia De Beers
General Counsel

AGREED AND ACCEPTED:

Peter Strojnik
STROJNIK, PC

# EXHIBIT 11

## CONFIDENTIAL SETTLEMENT AGREEMENT
## AND GENERAL AND SPECIAL RELEASE OF ALL CLAIMS

This Confidential Settlement Agreement and General and Special Release of all Claims ("Agreement") is entered into by and between Peter Strojnik ("Strojnik") on the one hand, and BH Partnership, L.P., a California limited partnership, dba the Bahia Resort Hotel and Evans Hotels LLC, a California limited liability company on another hand (together, "Evans"), on the other hand, which are each referred to herein as a "Party" and collectively as the "Parties."

## RECITALS

A.    WHEREAS, on or about August 10, 2018, Strojnik reserved an accessible room and stayed overnight at the Bahia Resort Hotel.

B.    WHEREAS, Strojnik expressed his intent to make claims against Evans related to or under the Unruh Civil Rights Act (Cal. Civ. Code §§ 51-52), the California Disabled Persons Act (Cal. Civ. Code §§54-54.3), the Americans with Disabilities Act, and associated regulations (e.g., 28 C.F.R. §36.302(e) and 28 CFR § 36.301).

C.    WHEREAS, Evans denies Strojnik's claims in full. However, in order to avoid the expense and uncertainty of litigation, Evans and Strojnik desire to settle any and all issues that have, or could have been raised, in relation to Strojnik's stay with Evans, or arising out of or in any way related to the acts, transactions, or occurrences between Strojnik and Evans.

NOW, THEREFORE, in consideration of the promises and mutual agreements hereinafter set forth, it is agreed by and between the undersigned as follows:

## AGREEMENT

1.    Settlement Payment. Evans shall pay the sum of TWO THOUSAND DOLLARS ($2,000.00) to Strojnik (the "Settlement Payment"). The Settlement Payment shall be made no later than ten (10) calendar days after the receipt of (i) a fully-executed copy of this Agreement and (ii) an executed IRS form W-9.

2.    Release. Strojnik fully and forever releases and discharges Evans, as well as their present and former parents, subsidiaries, affiliates, partners, shareholders, auditors, experts, owners, divisions, stockholders, heirs, executors, predecessors, assigns, officers, directors, agents, employees, members, assignees, transferees, insurers, accountants, attorneys and representatives and all persons acting by, though, under or in concert with them, or any of them (collectively, the "Evans Releasees"), of and from any and all liability, claims, manner of action or actions, cause or causes of action, in law or in equity, and any suits, debts, liens, contracts, agreements, promises, liabilities, relief, demands, damages, statutory or punitive damages, losses, costs and expenses, of any nature whatsoever, known or unknown, suspected or unsuspected, fixed or contingent, foreseen or unforeseen, of any kind or nature whatsoever that were or that could have been alleged in any court or other forum and were in existence as of the date of this Agreement relating to Strojnik's stay at Bahia Resort Hotel ("Released Claims").

3.    1542 Release. Strojnik expressly waive and relinquish, to the fullest extent permitted by law, the provisions, rights and benefits of California Civil Code Section 1542, or any other similar provision under federal or state law, which provides:

1

A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT
TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM
OR HER MUST HAVE MATERIALLY AFFECTED HIS OR
HIS SETTLEMENT WITH THE DEBTOR.

4.    Representation of No Suit and Covenant Not to Sue. Strojnik represents that, as
of the date of this Agreement, he has not filed any lawsuits, charges, complaints, petitions,
claims or other accusatory pleadings against Evans or any of the other Evans Releasees in any
court or with any governmental agency. Strojnik covenants and agrees that he will not make,
assert, or maintain any claim, action, or cause of action against the Evans Releasees related to the
Released Claims.

5.    No Assignment. Strojnik warrants and represents that he has not assigned or
transferred to any other person any of the Released Claims. Strojnik further represents that he
will not seek to assign or otherwise transfer the Released Claims to any other person or entity.

6.    No Admissions. By entering into this Agreement, the Evans Releasees make no
admission that they have engaged, or are now engaging, in any unlawful conduct. The Parties
understand and acknowledge that this Agreement is not an admission of liability and shall not be
used or construed as such in any legal or administrative proceeding.

7.    Confidentiality. The Parties expressly incorporate the protections of applicable
state law, including, but not limited to, California Evidence Code § 1152. Each Party agrees that
the terms of this Agreement will be kept confidential and will not be disclosed to any third party,
except (i) as required in response to a court order or subpoena, after giving prior notice to the
other Party and sufficient time for that Party to object to such disclosure, if possible; (ii) to a
governmental entity in connection with a tax audit or to comply with a tax obligation.
Notwithstanding the foregoing, each party may disclose to third parties that the matter has
settled. The Agreement and its terms, however, shall not be disclosed by any party to any third
party except as provided herein.

8.    Non Patronage. Strojnik and any agent, representative, or person acting on
Strojnik's behalf agrees not to visit, patronize, appear on, call, or otherwise come onto the
property of Evans Hotels or any of its corporate affiliates (including The Lodge at Torrey Pines,
the Bahia Resort Hotel, and the Catamaran Resort Hotel) for any purpose without the prior
written consent of Evans, confirmed in writing by Evans' General Counsel.

9.    Modifications and Amendments. No amendment, change, or modification of this
Agreement or any part thereof shall be valid unless in writing signed by the Parties or their
counsel.

10.    Advice of Counsel. Each Party represents that it has been represented, or has had
the opportunity to be represented, by independent legal counsel of its own choice, throughout all
of the negotiations that preceded the execution of this Agreement and that it has executed this
Agreement with the consent and upon the advice of such counsel, or that it has had the
opportunity to seek such consent and advice. Each Party acknowledges that it has read this
Agreement and assents to all the terms and conditions contained in this Agreement without any
reservations and that it has had, or has had the opportunity to have had, the same explained to it
by its own counsel, who have answered any and all questions which have been asked of them, or
which could have been asked of them, with regard to the meaning of any of the provisions of this
Agreement. The Parties state that they are fully competent to manage their business affairs, that
they fully understand this Agreement's final and binding effect, that the only promises made to

2

them to sign this Agreement are those stated and contained in this Agreement, and that they are signing this Agreement knowingly and voluntarily.

11.    Enforceability. The Parties understand and agree that this Agreement was entered into in the context of settlement discussions and is fully enforceable. The Parties agree to not challenge this Agreement as illegal, invalid, or unenforceable.

12.    Execution of Documents. This Agreement may be executed in one or more counterparts, each of which shall be an original as against any party who signed it, and all of which shall constitute one and the same document. Signatures to this Agreement may be transmitted by facsimile or electronic mail ("email") and such signatures, and true and correct copies thereof (including any copy on physical paper or electronically stored in .pdf, .tiff., .jpg, etc. formats), shall be deemed effective as original signatures.

13.    No Prejudice to the Drafter. Each Party has had a full and complete opportunity to review this Agreement, and make suggestions or changes, as has counsel for each Party. Accordingly, each Party understands that this Agreement is deemed to have been drafted jointly by the Parties, and the Parties agree that the common law principles of construing ambiguities against the drafter shall have no application. This Agreement should be construed fairly and not in favor of or against one Party as to the drafter.

14.    Severability of Agreement. If any provision of this Agreement is held by a court of competent jurisdiction to be invalid, void, or unenforceable for any reason, the remaining provisions shall remain valid and enforceable notwithstanding, unless the provision found to be unenforceable is of such material effect that this Agreement cannot be performed in accordance with the intent of the Parties in the absence of any such provision.

15.    Authority to Settle and Execute Agreement. The Parties warrant that they have the power, right, and authority to settle and release fully and completely all Released Claims that they are settling and releasing in this Agreement, and the undersigned signatories represent that they are fully authorized to execute and enter into the terms and conditions of this Agreement on behalf of the respective persons or entities for whom they have signed the Agreement.

/ / /

/ / /

/ / /

3

16.   <u>Miscellaneous</u>.  This Agreement shall be construed, enforced, and administered in accordance with the laws of the State of California, without giving effect to any choice or conflict of law provision.  Any claim or action arising out of or relating to this Agreement, or an alleged breach thereof, shall be brought in the courts of the State of California in each case located in City of San Diego, and each party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action, or proceeding.  In the event of any litigation concerning this Agreement, the prevailing party shall be entitled to, in addition to any other relief that may be granted, reasonable attorneys' fees and costs.

AGREED AND ACCEPTED:

DATED: <u>October 10, 2018</u>

By: Peter Strojnik

**BH Partnership, a California Limited Partnership**

DATED: <u>October 10, 2018</u>

By:   Julia De Beers
      General Counsel

**Evans Hotels, LLC**

DATED: <u>October 10, 2018</u>

By:   Julia De Beers
      General Counsel

4

# EXHIBIT 12

2/13/2019                                      Strojnik P.C. Mail - Scheduling Call



Peter Strojnik <ps@strojnik.com>

## Scheduling Call
12 messages

**Julia De Beers** <jdebeers@evanshotels.com>                    Wed, Jan 9, 2019 at 12:15 PM
To: Peter Strojnik <ps@strojnik.com>

Hi Peter,

I hope you had a great holiday season and a happy new year.  I'm following up to schedule a phone call on the consulting work you're doing for us.  I wanted to set up a 30 minute call to discuss a few potential alternative ways to train reservations agents to handle calls.  I'm available in the afternoon on Monday, January 14 and most of the day on Friday, January 18.

Additionally, one of the managers recently sent to my attention a courtesy pre-litigation notice from your office related to The Lodge at Torrey Pines, one of properties we manage.  I assume this is an administrative error from your office, as that would be problematic with respect to both the non-patronage clause in the settlement agreement and the consulting agreement.


Thanks,


Julia



Visit the
Evans Hotels
web site

Julia De Beers
*Chief Administrative Officer & General Counsel*
**Evans Hotels**
998 West Mission Bay Drive, San Diego, California 92109
Tel 858-539-8832  |  Fax 858-488-2524  |  EvansHotels.com

**Confidentiality Notice:** The information contained in this e-mail message is intended for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.



## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

2/13/2019                                    Strojnik P.C. Mail - Scheduling Call

**Peter Strojnik** <ps@strojnik.com>                                    Wed, Jan 9, 2019 at 9:41 PM
To: Julia De Beers <jdebeers@evanshotels.com>

Hi, Julia. It is good to hear from you. I hope 2019 finds you full of promise and adventure!

I am not nearly as concerned with the resolution in the Bahia matter as you appear to be. The consulting agreement had been fully performed and the settlement agreement did not release The Lodge at Torrey Pines.

It is unsettling that owners and managers of one property realize the extent of non-compliance with ADAAG with respect to that one property but then completely ignore the other properties they may own or manage. As you can glean from the (draft) Complaint and Addendum, our position is that the ADA status of the Hotel is lacking both with reference to booking standards of 28 CFR §36.302(e) and, generally, with the architectural requirements of 2010 Standards. We feel strongly about desegregation of individuals with disabilities. See (draft) Complaint at ¶¶3-4 and 42 U.S.C. § 12101(a).

But as we have expressed before, we do not feel that litigation is the best method of assuring integration. Although we are not averse to litigation, we believe that providing appropriate courtesy notice, as we have done, leads to a better, private resolution. Therefore, we propose:

1.    Agreement by the Hotel to make a list of accessible features for the Hotel that will be (1) provided to in-person and telephone reservations clerks (2) posted on Hotel's own website and (3) provided to third party booking websites (expedia.com, hotels.com etc.) through which a person can book a room at the Hotel. *See* 28CFR36.302(e); U.S. Dept. of Justice, Am. With Disabilities Act Title III Regulations, Nondiscrimination on the Basis of Disability by Public Accommodations and in Commercial Facilities, at p. 99 (Sep. 15, 2010);and 28 CFR Appendix A to Part 36, Guidance on Revisions to ADA Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and Commercial Facilities.
2.    Release of all claims and a covenant not to file lawsuits or administrative complaints for any claims related to your Hotel now or in the future; and

3.    Covenant to not book a room in order to discover additional non-compliant elements; however, as part of any amicable resolution we will encourage, but not require, you to conduct an accessibility review of the hotel property pursuant to the Americans with Disabilities Act, the 2010 Standards for Public Accommodations and Commercial Facilities Title III ("ADAAG") and applicable disability access regulations contained in Title 24 of the California Code of Regulations.; an

4.    Damages, costs and expenses in the amount of $9,500.00.

Please discuss this matter with the Hotel ownership and get back to me at your earliest opportunity. I attach a due diligence reports prepared with respect to this matter.
[Quoted text hidden]
--
Cordially,



Peter Strojnik
STROJNIK, P.C.
2375 East Camelback Road Suite 600
Phoenix, Arizona 85016
Telephone: 602-524-6602
e-mail ps@strojnik.com
Twitter: @strojnikpeter

This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify us by reply e-mail and immediately and permanently delete this message and any attachments.

---

📄 **Torrey Pines Club Corporation dba The Lodge at Torrey Pines ADA Report.pdf**
3276K

---

**Peter Strojnik** <ps@strojnik.com>                                    Thu, Jan 17, 2019 at 6:40 PM
To: Julia De Beers <jdebeers@evanshotels.com>

Hi, Julia. Where are we on this?
[Quoted text hidden]

---

**Julia De Beers** <jdebeers@evanshotels.com>                          Fri, Jan 18, 2019 at 2:38 PM
To: Peter Strojnik <ps@strojnik.com>

Peter,

I must respectfully disagree with your characterization of the engagement agreement, the settlement agreement, and your statements related to ADA compliance at The Lodge.

The Evans Entities' engagement with you and Strojnik, PC remains both active and incomplete. The scope of your obligations are set forth in the October 10, 2018 engagement letter. The first paragraph states that you would provide not only template questionnaires on ADA compliance, but also "consulting with Ms. De Beers" on ADA compliance. The latter has not occurred. Please let me know when you are available for a call, so that you can fulfill your obligations under the engagement letter.

It appears based on the documents you have sent that you stayed at The Lodge on December 8, 2018. Your stay violates the non-patronage clause in the settlement agreement that you signed two months before your visit: "Strojnik . . . agrees not to visit, patronize, appear on, call, or otherwise come onto the property of Evans Hotels or any of its corporate affiliates (including The Lodge at Torrey Pines . . . ) for any purpose . . . " and is a clear violation of the settlement agreement. Please note that my client will aggressively defend and pursue all available remedies, including a counterclaim for breach of the consulting agreement and the settlement agreement, including recovery of attorney's fees under the fees clause therein.

I remind you of the points raised in my September 4, 2018 letter, as it is still unclear whether you have standing to pursue mobility accessibility claims when publicly available videos show you walking at a rather brisk pace without any mobility aids. Nor would you, as a pro per plaintiff, have the ability recover attorney's fees under the law.

For the reasons above, I cannot authorize a settlement of the threatened litigation against The Lodge, and request that you send some available dates/times for a call. This is not intended to be a full statement of the facts relating to this matter, and should not be construed as a waiver of any of Evans Hotels' rights or remedies, all of which are expressly reserved.

Thanks,

Julia

Julia De Beers

2/13/2019                                   Strojnik P.C. Mail - Scheduling Call

**Evans Hotels**
998 West Mission Bay Drive, San Diego, California 92109
Tel 858-539-8832 | Fax 858-488-2524 | EvansHotels.com

**Confidentiality Notice:** The information contained in this e-mail message is intended for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

[Quoted text hidden]

---

Peter Strojnik <ps@strojnik.com>                                   Fri, Jan 18, 2019 at 3:12 PM
To: Julia De Beers <jdebeers@evanshotels.com>

Hi, Julia.

Indeed, if I had stayed at The Lodge at Torrey Pines that would have been a breach of the agreement for which your client would be entitled to actual damages and I wouldbe entitled to enforce the ADA. But I did not stay there so your client has no contractual claim, but I do have the ADA and Unruh claims.

The operative part of the consulting agreement states:

> This letter will confirm that as of October 10, 2018, Peter Strojnik was asked by Evans Hotels, LLC, a hotel management company, to provide the type of accessibility information that a mobility disadvantaged guest may wish to review on a booking website or from an in house booking agent. Strojnik shall be paid a flat fee of $3,000, which shall include Strojnik providing template questionnaires on ADA compliance and consulting with Ms. De Beers regarding such matters.

I provided you with the template questionnaire as agreed and we consulted regarding it.

The party you are referencing relates only to confidentiality:

> Under this engagement, all communications between the Evans Entities and Strojnik, including communications between Strojnik and Ms. De Beers, shall be for the sole purpose of assisting Strojnik in performing the services under this agreement. Strojnik will not disclose to anyone, without the Evans Entities' written permission, the nature or content of any oral or written communication, nor any information gained from the inspection of any record(s) or document(s) submitted to Strojnik, including information obtained from corporate records or documents, and Strojnik will not permit inspection of any papers or documents without our prior written permission. As part of Strojnik's engagement, Strojnik will immediately notify the Evans Entities of the happening of any one of the following events: (a) the exhibition or surrender of any documents or records submitted to Strojnik or someone under Strojnik's direction, in a manner not expressly authorized by the Evans Entities; (b) a request by anyone to examine, inspect, or copy such documents or records; (c) any attempt to serve, or the actual service of any court order, subpoena, or summons requiring the production of any such documents or records. Strojnik will immediately return all documents, records or work papers to us at our request.

However, in the spirit of good faith and fair dealing, please send me the questions you wish to discuss relating to "accessibility information that a mobility disadvantaged guest may wish to review on a booking website or from an in house booking agent..."

This is the best I can do.

[Quoted text hidden]

---

Peter Strojnik <ps@strojnik.com>                                   Wed, Jan 30, 2019 at 5:43 PM
To: Julia De Beers <jdebeers@evanshotels.com>

Hi, Julia. Can you give me a status on this matter? I need to fish or cut bait...

2/13/2019                                                                                          Strojnik P.C. Mail - Scheduling Call

[Quoted text hidden]

---

**Julia De Beers** <jdebeers@evanshotels.com>                                                      Sat, Feb 2, 2019 at 7:42 AM
To: Peter Strojnik <ps@strojnik.com>

Hi Peter,

I am recovering from the flu, it will take me a few days to dig out.

Thanks,

Julia

Sent from my iPhone

On Jan 30, 2019, at 4:43 PM, Peter Strojnik <ps@strojnik.com<mailto:ps@strojnik.com>> wrote:

Hi, Julia. Can you give me a status on this matter? I need to fish or cut bait...

On Fri, Jan 18, 2019 at 3:12 PM Peter Strojnik <ps@strojnik.com<mailto:ps@strojnik.com>> wrote:
Hi, Julia.

Indeed, if I had stayed at The Lodge at Torrey Pines that would have been a breach of the agreement for which your client was entitled to actual damages and I wouldbe entitled to enforce the ADA. But I did not stay there so your client has no contractual claim, but I do have the ADA and Unruh claims.

The operative part of the consulting agreement states:

<image.png>

I provided you with the template questionnaire as agreed and we consulted regarding it.

The party you are referencing relates only to confidentiality:

<image.png>
However, in the spirit of good faith and fair dealing, please send me the questions you wish
to discuss relating to "accessibility information that a mobility disadvantaged
guest may wish to review on a booking website or from an in house booking agent..."

This is the best I can do.


On Fri, Jan 18, 2019 at 2:38 PM Julia De Beers <jdebeers@evanshotels.com<mailto:jdebeers@evanshotels.com>>
wrote:
Peter,

I must respectfully disagree with your characterization of the engagement agreement, the settlement agreement, and your statements related to ADA compliance at The Lodge.

The Evans Entities' engagement with you and Strojnik, PC remains both active and incomplete. The scope of your obligations are set forth in the October 10, 2018 engagement letter. The first paragraph states that you would provide not only template questionnaires on ADA compliance, but also "consulting with Ms. De Beers" on ADA compliance. The latter has not occurred. Please let me know when you are available for a call, so that you can fulfill your obligations under the engagement letter.

It appears based on the documents you have sent that you stayed at The Lodge on December 8, 2018. Your stay violates the non-patronage clause in the settlement agreement that you signed two months before your visit: "Strojnik . . . agrees not to visit, patronize, appear on, call, or otherwise come onto the property of Evans Hotels or any of its corporate affiliates (including The Lodge at Torrey Pines . . . ) for any purpose . . . " and is a clear violation of the settlement agreement. Please note that my client will aggressively defend and pursue all available remedies, including a counterclaim for breach of the consulting agreement and the settlement agreement, including recovery of attorney's fees under the fees clause therein.

I remind you of the points raised in my September 4, 2018 letter, as it is still unclear whether you have standing to pursue

mobility accessibility claims when publicly available videos show you walking at a rather brisk pace without any mobility aids. Nor would you, as a pro per plaintiff, have the ability recover attorney's fees under the law.

For the reasons above, I cannot authorize a settlement of the threatened litigation against The Lodge, and request that you send some available dates/times for a call. This is not intended to be a full statement of the facts relating to this matter, and should not be construed as a waiver of any of Evans Hotels' rights or remedies, all of which are expressly reserved.

Thanks,

Julia

Julia De Beers
Evans Hotels
998 West Mission Bay Drive, San Diego, California 92109
Tel 858-539-8832 | Fax 858-488-2524 | EvansHotels.com<http://www.evanshotels.com/>

Confidentiality Notice: The information contained in this e-mail message is intended for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

From: Peter Strojnik [mailto:ps@strojnik.com<mailto:ps@strojnik.com>]
Sent: Thursday, January 17, 2019 5:40 PM
To: Julia De Beers <jdebeers@evanshotels.com<mailto:jdebeers@evanshotels.com>>
Subject: Re: Scheduling Call

Hi, Julia. Where are we on this?

On Wed, Jan 9, 2019 at 9:41 PM Peter Strojnik <ps@strojnik.com<mailto:ps@strojnik.com>> wrote:
Hi, Julia. It is good to hear from you. I hope 2019 finds you full of promise and adventure!

I am not nearly as concerned with the resolution in the Bahia matter as you appear to be. The consulting agreement had been fully performed and the settlement agreement did not release The Lodge at Torrey Pines.

It is unsettling that owners and managers of one properly realize the extent of non-compliance with ADAAG with respect to that one property but then completely ignore the other properties they may own or manage. As you can glean from the (draft) Complaint and Addendum, our position is that the ADA status of the Hotel is lacking both with reference to booking standards of 28 CFR §36.302(e) and, generally, with the architectural requirements of 2010 Standards. We feel strongly about desegregation of individuals with disabilities. See (draft) Complaint at ¶¶3-4 and 42 U.S.C. § 12101(a).

But as we have expressed before, we do not feel that litigation is the best method of assuring integration. Although we are not averse to litigation, we believe that providing appropriate courtesy notice, as we have done, leads to a better, private resolution. Therefore, we propose:

1. Agreement by the Hotel to make a list of accessible features for the Hotel that will be (1) provided to in-person and telephone reservations clerks (2) posted on Hotel's own website and (3) provided to third party booking websites (expedia.com<http://expedia.com>, hotels.com<http://hotels.com> etc.) through which a person can book a room at the Hotel. See 28CFR36.302(e); U.S. Dept. of Justice, Am. With Disabilities Act Title III Regulations, Nondiscrimination on the Basis of Disability by Public Accommodations and Commercial Facilities, at p. 99 (Sep. 15, 2010);and 28 CFR Appendix A to Part 36, Guidance on Revisions to ADA Regulation on Nondiscrimination on the Basis of Disability by Public Accommodations and Commercial Facilities.
2. Release of all claims and a covenant not to file lawsuits or administrative complaints for any claims related to your Hotel now or in the future; and
3. Covenant to not book a room in order to discover additional non-compliant elements; however, as part of any amicable resolution we will encourage, but not require, you to conduct an accessibility review of the hotel property pursuant to the Americans with Disabilities Act, the 2010 Standards for Public Accommodations and Commercial Facilities Title III ("ADAAG") and applicable disability access regulations contained in Title 24 of the California Code of Regulations.; an
4. Damages, costs and expenses in the amount of $9,500.00.

Please discuss this matter with the Hotel ownership and get back to me at your earliest opportunity. I attach a due diligence reports prepared with respect to this matter.

On Wed, Jan 9, 2019 at 12:15 PM Julia De Beers <jdebeers@evanshotels.com<mailto:jdebeers@evanshotels.com>> wrote:
Hi Peter,

2/13/2019                                    Strojnik P.C. Mail - Scheduling Call

I hope you had a great holiday season and a happy new year. I'm following up to schedule a phone call on the consulting work you're doing for us. I wanted to set up a 30 minute call to discuss a few potential alternative ways to train reservations agents to handle calls. I'm available in the afternoon on Monday, January 14 and most of the day on Friday, January 18.

Additionally, one of the managers recently sent to my attention a courtesy pre-litigation notice from your office related to The Lodge at Torrey Pines, one of properties we manage. I assume this is an administrative error from your office, as that would be problematic with respect to both the non-patronage clause in the settlement agreement and the consulting agreement.

Thanks,

Julia

[Visit the Evans Hotels web site]<http://www.evanshotels.com/about.php>

Julia De Beers
Chief Administrative Officer & General Counsel
Evans Hotels
998 West Mission Bay Drive, San Diego, California 92109
Tel 858-539-8832 | Fax 858-488-2524 | EvansHotels.com<http://www.evanshotels.com>

Confidentiality Notice: The information contained in this e-mail message is intended for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by Mimecast Ltd, an innovator in Software as a Service (SaaS) for business. Providing a safer and more useful place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here<http://www.mimecast.com/products/>.

--
Cordially,

[https://docs.google.com/uc?export=download&id=1ou6V4wLGPlhhQ_CMsUEt1-6yGWdCmSHs&revid=
0B7ZaA1srxhqAaHE4Yi9kaVVLdXFBM2NMOHM5c1NoV1hiaTlzPQ]
Peter Strojnik
STROJNIK, P.C.
2375 East Camelback Road Suite 600<https://maps.google.com/?q=2375+East+Camelback+Road+
Suite+600+Phoenix,+Arizona+85016&entry=gmail&source=g>
Phoenix, Arizona 85016<https://maps.google.com/?q=2375+East+Camelback+Road+Suite+600+Phoenix,+Arizona+
85016&entry=gmail&source=g>
Telephone: 602-524-6602<tel:(602)%20524-6602>
e-mail ps@strojnik.com<mailto:ada@strojnik.com>
Twitter: @strojnikpeter

This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify us by reply e-mail and immediately and permanently delete this message and any attachments.

2/13/2019                                    Strojnik P.C. Mail - Scheduling Call

--
Cordially,

[https://docs.google.com/uc?export=download&id=1ou6V4wLGPIhhQ_CMsUEt1-6yGWdCmSHs&revid=
0B7ZaA1srxhqAaHE4Yi9kaVVLdXFBM2NMOHM5c1NoV1hiaTlzPQ]
Peter Strojnik
STROJNIK, P.C.
2375 East Camelback Road Suite 600<https://maps.google.com/?q=2375+East+Camelback+Road+
Suite+600+Phoenix,+Arizona+85016&entry=gmail&source=g>
Phoenix, Arizona 85016<https://maps.google.com/?q=2375+East+Camelback+Road+Suite+600+Phoenix,+Arizona+
85016&entry=gmail&source=g>
Telephone: 602-524-6602<tel:(602)%20524-6602>
e-mail ps@strojnik.com<mailto:ada@strojnik.com>
Twitter: @strojnikpeter


This message and any attachments are solely for the intended recipient and may contain confidential or privileged
information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included
in this message and any attachments is prohibited. If you have received this communication in error, please notify us by
reply e-mail and immediately and permanently delete this message and any attachments.


--
Cordially,

[https://docs.google.com/uc?export=download&id=1ou6V4wLGPIhhQ_CMsUEt1-6yGWdCmSHs&revid=
0B7ZaA1srxhqAaHE4Yi9kaVVLdXFBM2NMOHM5c1NoV1hiaTlzPQ]
Peter Strojnik
STROJNIK, P.C.
2375 East Camelback Road Suite 600<https://maps.google.com/?q=2375+East+Camelback+Road+
Suite+600+Phoenix,+Arizona+85016&entry=gmail&source=g>
Phoenix, Arizona 85016<https://maps.google.com/?q=2375+East+Camelback+Road+Suite+600+Phoenix,+Arizona+
85016&entry=gmail&source=g>
Telephone: 602-524-6602<tel:(602)%20524-6602>
e-mail ps@strojnik.com<mailto:ada@strojnik.com>
Twitter: @strojnikpeter


This message and any attachments are solely for the intended recipient and may contain confidential or privileged
information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included
in this message and any attachments is prohibited. If you have received this communication in error, please notify us by
reply e-mail and immediately and permanently delete this message and any attachments.


--
Cordially,

[https://docs.google.com/uc?export=download&id=1ou6V4wLGPIhhQ_CMsUEt1-6yGWdCmSHs&revid=
0B7ZaA1srxhqAaHE4Yi9kaVVLdXFBM2NMOHM5c1NoV1hiaTlzPQ]
Peter Strojnik
STROJNIK, P.C.
2375 East Camelback Road Suite 600<https://maps.google.com/?q=2375+East+Camelback+Road+
Suite+600+Phoenix,+Arizona+85016&entry=gmail&source=g>
Phoenix, Arizona 85016<https://maps.google.com/?q=2375+East+Camelback+Road+Suite+600+Phoenix,+Arizona+
85016&entry=gmail&source=g>
Telephone: 602-524-6602<tel:(602)%20524-6602>
e-mail ps@strojnik.com<mailto:ada@strojnik.com>
Twitter: @strojnikpeter


This message and any attachments are solely for the intended recipient and may contain confidential or privileged
information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included
in this message and any attachments is prohibited. If you have received this communication in error, please notify us by
reply e-mail and immediately and permanently delete this message and any attachments.

2/13/2019                                    Strojnik P.C. Mail - Scheduling Call

**2 attachments**

image.png
159K

image.png
431K

---

**Peter Strojnik** <ps@strojnik.com>                           Sat, Feb 2, 2019 at 8:51 AM
To: Julia De Beers <jdebeers@evanshotels.com>

  All the best and quick recovery to you Julia
  [Quoted text hidden]

---

**Peter Strojnik** <ps@strojnik.com>                          Mon, Feb 11, 2019 at 8:42 AM
To: Julia De Beers <jdebeers@evanshotels.com>

Good morning, Julia.

I hope you are feeling better. I am still unsure of your client's intent on this matter but will have to make a decision by 2/18/19.

Please call to discuss at your convenience.
[Quoted text hidden]
--
Cordially,



Peter Strojnik
STROJNIK
7847 N. Central Ave.
Phoenix, AZ 85020
Telephone: 602-524-6602
e-mail ps@strojnik.com
Twitter: @strojnikpeter

This message and any attachments are solely for the intended recipient and may contain confidential or privileged information. If you are not the intended recipient, any disclosure, copying, use, or distribution of the information included in this message and any attachments is prohibited. If you have received this communication in error, please notify us by reply e-mail and immediately and permanently delete this message and any attachments.

---

**Julia De Beers** <jdebeers@evanshotels.com>                  Wed, Feb 13, 2019 at 6:22 PM
To: Peter Strojnik <ps@strojnik.com>

Hi Peter,

Thank you for your well-wishes, I am feeling much better.

I find your statement that you did not stay at The Lodge rather strange, as your cover letter to Mr. Gross states the contrary.  This leads to further questions about your standing to pursue a claim against Evans Hotels or The Lodge.

While I appreciate the offer to provide the consulting service by email, your concurrent threat to sue us means there are intractable conflicts of interest and ethical issues that I see no way of resolving unless you withdraw your threat.

Please confirm you are dropping the threatened claim so we can work towards completing your obligations under the consulting agreement.  Otherwise, your pursuit of claims against The Lodge will result in multiple breaches of contract, leaving us no choice but to pursue those claims against you.

This is not intended to be a full statement of our rights, all of which are expressly reserved.

Julia

Julia De Beers

**Evans Hotels**
998 West Mission Bay Drive, San Diego, California 92109
Tel 858-539-8832  |  Fax 858-488-2524  |  EvansHotels.com

**Confidentiality Notice:** The information contained in this e-mail message is intended for the personal and confidential use of the recipient(s) named above. If you have received this communication in error, please notify us immediately by e-mail and delete the original message.

**From:** Peter Strojnik [mailto:ps@strojnik.com]
**Sent:** Monday, February 11, 2019 7:43 AM
**To:** Julia De Beers <jdebeers@evanshotels.com>
**Subject:** Re: Scheduling Call

[Quoted text hidden]

---

**Peter Strojnik** <ps@strojnik.com>                                    Wed, Feb 13, 2019 at 6:29 PM
To: Julia De Beers <jdebeers@evanshotels.com>

I will file the lawsuit tomorrow and then we can resolve all the issues to bring up
[Quoted text hidden]

---

**Peter Strojnik** <ps@strojnik.com>                                    Wed, Feb 13, 2019 at 7:02 PM
To: Julia De Beers <jdebeers@evanshotels.com>

2/13/2019                                    Strojnik P.C. Mail - Scheduling Call

Hi again, Julia. I attach the Complaint that I will file tomorrow, the history of our negotiations in the Bahia matter and the e-mail string.

I would like to extend you until tomorrow at 10:00am to discuss. If our dispute may cause you employment difficulties I will take that into consideration.

Please retain all penitentiary evidentiary materials regarding this and the Bahia matters.

I truly regret that is has come to this.
[Quoted text hidden]

---

**9 attachments**

📄 **Torrey Pines Club Corporation dba The Lodge At Torrey Pines Complaint.pdf**
3134K

📄 **1. Confidential Consulting Agreement.pdf**
97K

📄 **1. Confidential Settlement Agreement.pdf**
86K

📄 **2. Confidential Consulting Agreement REDLINED.pdf**
98K

📄 **2. Confidential Settlement Agreement REDLINED.pdf**
86K

📄 **3. Evans Consulting Agreement Signed.pdf**
1287K

📄 **3. Evans Settlement Agreement Signed.pdf**
3683K

📄 **4. Evans Consulting Agreement FULLY EXECUTED.pdf**
1295K

📄 **4. Evans Settlement Agreement FULLY EXECUTED.pdf**
3690K

# EXHIBIT 13

**2017.CA.0002157< http://www.versuslaw.com>**

**MUHAMMAD IQBAL, Plaintiff and Appellant,**

**v.**

**IMRAN ZIADEH, Defendant and Respondent.**

**C075203**

**California Court of Appeals, Third District, San Joaquin**

**March 24, 2017**

APPEAL from a judgment of the Superior Court of San Joaquin County No. 39-2012-00284517-CU-PO-STK, Bobby W. McNatt, Judge. Reversed with directions.

Sodhi Law Group, Jakrun S. Sodhi and Ameet S. Birring; Arata, Swingle, Sodhi & Van Egmond, Bradley J. Swingle and Colleen F. Van Egmond for Plaintiff and Appellant.

Hayes, Scott, Bonino, Ellingson & McLay, Mark G. Bonino, Stephen P. Ellingson, Dara M. Tang, and Tara S. Nayak; Gregory J. Goodwin for Defendant and Respondent.

NICHOLSON, J.

Plaintiff Muhammad Iqbal appeals from a summary judgment entered against his complaint for personal injuries. The trial court ruled the complaint was barred by a general release plaintiff had previously executed that immunized "affiliates" of the defendants in the former case, and defendant Imran Ziadeh was such an affiliate. We conclude as a matter of law defendant was not a protected "affiliate, " as that term is commonly understood. We reverse.

FACTS AND PROCEDURAL HISTORY

In 2011, plaintiff sued Yosemite Auto Sales, Inc. (Yosemite Auto), its owner Eyad Kaid, and Alla Abuziadeh, individually and doing business as Jimmy's Tow (collectively, the former defendants), for personal injuries. He alleged Yosemite Auto retained him to determine why a vehicle it owned would not start. Unknown to plaintiff, Abuziadeh earlier towed the vehicle to Yosemite Auto and disconnected the transmission shift linkage to do so. He allegedly did not reconnect the shift linkage after towing the car.

Plaintiff alleged he confirmed the vehicle was in "park, " and he went underneath it to determine why it would not start. When he tested the electrical connection to the starter, the vehicle immediately ran over him and dragged him through Yosemite Auto's parking lot. Plaintiff's spine was crushed.

Plaintiff and the former defendants reached a settlement. Kaid and Yosemite Auto tendered their insurance policy limit of $1, 000, 000. Plaintiff dismissed the action with prejudice as to Yosemite Auto and Kaid and released all former defendants from liability "including, without limitation, any and all known or unknown claims...." Of significance here, the release included within its scope the former defendants' "affiliates" and "all other persons, firms, or corporations, with whom any of the former have been, are now or may hereafter be affiliated."

In 2012, and more than three months after he settled the first action, plaintiff brought this action against defendant Imran Ziadeh. At the time of the accident, Kaid and Yosemite Auto leased the land for their business from defendant Ziadeh. Defendant had previously operated a used car dealership on the property. Upon leasing the property to Kaid and Yosemite Auto, defendant entered into an agreement with Yosemite Auto under which he left several vehicles from his used car dealership on the property on a consignment basis for Yosemite Auto to sell. The vehicle that injured plaintiff was one of those vehicles. Defendant was the person who recommended plaintiff to Yosemite Auto to fix that vehicle. Plaintiff based this action on the same facts as his first action, and he sued defendant for negligence and premises liability.

Defendant filed a motion for summary judgment. He claimed he was an "affiliate" of Yosemite Auto for purposes of the release in the first action's settlement agreement, and thus he could not be held liable for any claim arising out of the accident. He submitted extrinsic evidence to support his interpretation of the release. That evidence consisted in pertinent part of a declaration by defendant's counsel who also represented Yosemite Auto in the first action. Counsel stated he intended the release in the first action's settlement agreement to be a general release applicable to all persons, known and unknown, who were associated in any manner with the accident, including defendant.

Plaintiff opposed the motion for summary judgment. He contended the release was ambiguous and there were disputed issues of material fact regarding the release's intent. He submitted extrinsic evidence to establish the parties to the release did not intend for it to apply to defendant because defendant was never a contemplated or known party. Plaintiff's counsel stated he was never aware of defendant's potential liability or that defendant and Yosemite Auto "were affiliated" because Yosemite Auto never disclosed the relationship during discovery in the first action. Nor did

Yosemite Auto or its insurer disclose that defendant maintained a $1,000,000
insurance policy with the same insurer who insured Yosemite Auto. Counsel also
submitted copies of correspondence between him and counsel representing the former
defendants showing no one expressly mentioned or considered defendant during the
negotiations over the release.

The trial court granted defendant's motion for summary judgment, concluding
defendant was an affiliate for purposes of the release as a matter of law. The court
stated: "To me, the analysis begins and ends with whether or not [defendant] has
produced evidence showing that he is an affiliate of or affiliated with the business that
has already sued or been sued and tendered policy limits. [¶] Under that declaration, it
appears that [defendant] owns the property at 777 East Yosemite Avenue, and
pursuant to a lease agreement, Yosemite Auto Sales conducts its business on that
property. [¶] He entered into an agreement. [Defendant] entered into the agreement
with [Yosemite Auto] whereby his dealership consigned several vehicles to [Yosemite
Auto] to sell. [¶] As such, I think that within the clear definition of 'affiliate' found in
any dictionary, he was included or contemplated within the language of the release."

DISCUSSION

Plaintiff contends the trial court erred in granting summary judgment. He argues
(1) the extrinsic evidence he submitted established a disputed issue of material fact
regarding the meaning of the words "affiliates" and "affiliated" as used in the release;
(2) the court erred in admitting defendant's extrinsic evidence; and (3) the court erred
in concluding as a matter of law that defendant was a third party beneficiary of, and
immunized by, the release.

We conclude the undisputed evidence demonstrates defendant was not Yosemite
Auto's "affiliate," as that term is commonly understood, and thus was not immunized
from liability by the release in the first action.

I

*Standard of Review*

A trial court will grant summary judgment where there is no triable issue of
material fact and the moving party is entitled to judgment as a matter of law. A
defendant moving for summary judgment must prove the action has no merit. He does
this by showing plaintiff cannot establish one or more elements of his cause of action
or that there is a complete defense to the cause of action. Plaintiff then bears the
burden of showing a triable issue of material fact exists as to that cause of action or

defense. (Code Civ. Proc., § 437c, subds. (c), (o)(2); *Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 843, 849-850.)

On appeal, we exercise our independent judgment. (*Starzynski v. Capital Public Radio, Inc.* (2001) 88 Cal.App.4th 33, 37.) In determining whether there is a triable issue of material fact, we consider all the evidence set forth by the parties except that to which objections have been made and properly sustained. (Code Civ. Proc., § 437c, subd. (c); *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) We resolve evidentiary conflicts, doubts, or ambiguities in the opposing party's favor. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 768.)

II

*Interpretation of the Release*

At issue is whether plaintiff and the former defendants intended the release to immunize defendant, a third party, against liability arising from the accident as an affiliate of Yosemite Auto. We conclude as a matter of law they did not. Defendant was not an affiliate of Yosemite Auto as he had no type of ownership, fiduciary, agency, or dependent relationship to the former defendants. Plaintiff and the former defendants did not intend the release to protect defendant.

"Under subdivision (a) of section 877 of the Code of Civil Procedure, a release given in good faith to a tortfeasor 'shall not discharge any other such party from liability unless its terms so provide....' In determining whether the 'terms so provide' (*ibid.*), we apply the same rules that govern any other contract. (See Civ. Code, § 1635 ['All contracts... are to be interpreted by the same rules, except as otherwise provided by this Code']; see also *Neverkovec v. Fredericks* (1999) 74 Cal.App.4th 337, 348 (*Neverkovec*); *Appleton v. Waessil* (1994) 27 Cal.App.4th 551, 554.)

"A third party beneficiary may enforce a contract made for its benefit. (Civ. Code, § 1559.) However, '[a] putative third party's rights under a contract are predicated upon the contracting parties' intent to benefit' it. (*Garcia v. Truck Ins. Exchange* (1984) 36 Cal.3d 426, 436 [].) Ascertaining this intent is a question of ordinary contract interpretation. (*Ibid.*) Thus, '[t]he circumstance that a literal contract interpretation would result in a benefit to the third party is not enough to entitle that party to demand enforcement.' (*Neverkovec, supra,* 74 Cal.App.4th at p. 348.)

"Under long-standing contract law, a 'contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful.' (Civ. Code, § 1636.) Although 'the intention of the parties is to be ascertained from the writing alone, if possible' (*id.,* §

1639), '[a] contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates' (*id., § 1647*). 'However broad may be the terms of a contract, it extends only to those things... which it appears that the parties intended to contract.' (*Id., § 1648.*)" (*Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 524 [].)

"Extrinsic evidence is admissible to prove a meaning to which the contract is reasonably susceptible. (*Powers v. Dickson, Carlson & Campillo* (1997) 54 Cal.App.4th 1102, 1111; *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) If the trial court decides, after receiving the extrinsic evidence, the language of the contract is reasonably susceptible to the interpretation urged, the evidence is admitted to aid in interpreting the contract. (*Powers v. Dickson, Carlson & Campillo, supra,* 54 Cal.App.4th 1102, 1111; *Appleton v. Waessil*[, *supra,* ]27 Cal.App.4th 551, 554; *Winet v. Price, supra,* 4 Cal.App.4th 1159, 1165.) Thus, '[t]he test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible.' (*Pacific Gas & E. Co. v. G. W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 37.)

"The threshold issue of whether to admit the extrinsic evidence-that is, whether the contract is reasonably susceptible to the interpretation urged-is a question of law subject to de novo review. (*Appleton v. Waessil, supra,* 27 Cal.App.4th 551, 554-555; *Winet v. Price, supra,* 4 Cal.App.4th 1159, 1165-1166.)

"The ultimate construction placed on the contract might call for different standards of review. When no extrinsic evidence is introduced, or when the competent extrinsic evidence is not in conflict, the appellate court independently construes the contract. (*Parsons v. Bristol Development Co.* (1965) 62 Cal.2d 861, 865; *Winet v. Price, supra,* 4 Cal.App.4th at p. 1166.) When the competent extrinsic evidence is in conflict, and thus requires resolution of credibility issues, any reasonable construction [following a trial] will be upheld if it is supported by substantial evidence. (*Winograd v. American Broadcasting Co.* (1998) 68 Cal.App.4th 624, 632; *Winet v. Price, supra,* 4 Cal.App.4th at p. 1166.)

"California recognizes the objective theory of contracts (*Berman v. Bromberg* (1997) 56 Cal.App.4th 936, 948), under which '[i]t is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation' (*Titan Group, Inc. v. Sonoma Valley County Sanitation Dist.* (1985) 164 Cal.App.3d 1122, 1127). The parties' undisclosed intent or understanding is irrelevant to contract interpretation. (*Winograd v. American Broadcasting Co., supra,* 68 Cal.App.4th at p. 632; *Berman v. Bromberg, supra,* 56

Cal.App.4th at p. 948.)" (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) <u>109 Cal.App.4th 944</u>, 955-956.)

With these principles in mind, we turn first to the language of the release. It states in pertinent part: "Plaintiff hereby completely releases and forever discharges the [former] Defendants from any and all past, present or future claims... of any damages... of any nature whatsoever, whether based on a tort, contract or other theory of recovery, which the Plaintiff now has, or which may hereafter accrue or otherwise be acquired, on account of, or in any way grow out of the [accident]... including, without limitation, any and all known or unknown claims for bodily and personal injuries to the Plaintiff... which have resulted or may result from the alleged acts or omissions of the [former] Defendants. [¶]... This release and discharge shall inure to the benefit of [the former] Defendants' present and future officers, directors, stockholders, attorneys, agents, servants, representatives, employees, subsidiaries, *affiliates*, partners, predecessors and successors in interest, and assigns and all other persons, firms, or corporations, with whom any of the former have been, are now or may hereafter be *affiliated*." (Italics added.)

Defendant is protected against liability under this release only if plaintiff and the former defendants intended to consider him as one of the parties' affiliates or as a person with whom any of the signing parties' officers, directors, etc., were affiliated. Defendant argues the terms "affiliates" and "affiliated" are not ambiguous and the trial court correctly found he was an affiliate of Yosemite Auto. Without citing to any authority, he asserts an affiliate is "one who is in close association or connection with another" or "in legal or factual association or affiliation with" another. He contends the undisputed evidence demonstrated he was an affiliate of or affiliated with Yosemite Auto because he leased property to Yosemite Auto and because Yosemite Auto agreed to sell his cars on consignment.

We agree the term "affiliate" is unambiguous, but we disagree with defendant and the trial court's interpretation of the term. The word refers to a relationship that is closer than a mere arm's length contractual relationship. The ordinary and usual meaning of the noun "affiliate" is "an affiliated person or organization." (Merriam-Webster's Collegiate Dict. (11th ed. 2003) p. 21, col. 2.) The adjective "affiliated" means "closely associated with another *typically in a dependent or subordinate position* <the university and its ~ medical school>." (*Ibid.*, italics added.)

Other sources note an affiliate is one who has a dependent relationship with another. Black's Law Dictionary defines an "affiliate" outside of the securities context as "[a] corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." (Black's Law Dict. (10th ed. 2014) p. 69, col. 2.)

The online Oxford English Dictionary defines the *noun* "affiliate" as "[a] person or organization that is affiliated with a larger body; a member. Also: an associate of another person or organization; a fellow member of a larger body." (<http://www.oed.com/view/Entry/3402?rskey=015u3H&result=1#eid> [as of Mar. 24, 2017].) It defines "affiliated" as being "connected with a larger or more established body, often as a branch or subsidiary part; that is associated with a main or major group; that is an affiliate or member." (<http://www.oed.com/view/Entry/3404?redirectedFrom=affiliated#eid> [as of Mar. 24, 2017].)

The online Oxford English Dictionary defines the *verb* "affiliate" in similar ways: "To be connected with a larger or more established organization, as a branch or subsidiary part; to adhere or belong to an organization or group; to be a member or affiliate of a certain body. Also more generally: to be a part of something.... [¶] To join or unite with an organization or group; *esp.* to connect or align oneself with a larger or more established group of people; to attach oneself to an organization as a branch, subsidiary part, or affiliate.... [¶] To connect or align (a group, institution, etc.) with another body, typically one that is larger or more established; to cause to become a branch, subsidiary part, or affiliate of such a body. Also: to cause (an individual) to be a member or part of any group or organization." (<http://www.oed.com/view/Entry/3403?rskey=hTBCF1&result=2#eid> [as of Mar. 24, 2017].)

These sources indicate the common meaning of an affiliate generally is one who is dependent upon, subordinate to, an agent of, or part of a larger or more established organization or group. This is a closer association than that of defendant's, who had only a contractual relationship with Yosemite Auto. There is no evidence those contracts, a lease and a consignment agreement, made defendant dependent upon, under the control of, an agent of, or a part of Yosemite Auto.

Our attempt to define "affiliate" does not end here. " '[T]he character of a contract is not to be determined by isolating any single clause or group of clauses....' (*Transportation Guarantee Co. v. Jellins* (1946) <u>29 Cal.2d 242</u>, 247-248.) On the contrary, '[a] contract is to be construed as a whole, "so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other." ' (*McCaskey v. California State Auto. Assn.* (2010) 189 Cal.App.4th 947, 970, quoting Civ. Code, § 1641; see *Zalkind v. Ceradyne, Inc.* (2011) 194 Cal.App.4th 1010, 1027, 1029; *Lemm v. Stillwater Land & Cattle Co.* (1933) <u>217 Cal. 474</u>, 480 ['Although the language of the contract must govern its interpretation (Civ. Code, [§§] 1638, 1639), nevertheless the meaning is to be obtained from the entire contract, and not from any one or more isolated portions thereof.'].)" (*Epic Communications, Inc. v. Richwave Technology, Inc.* (2015) <u>237 Cal.App.4th 1342</u>, 1349.)

Other provisions in the settlement agreement reinforce our interpretation of
"affiliate" as the interpretation plaintiff and the former defendants intended. First, the
release extends primarily to persons or entities who are owners, fiduciaries,
employees, or agents of the former defendants. The release benefits the former
defendants' "present and future officers, directors, stockholders, attorneys, agents,
servants, representatives, employees, subsidiaries, affiliates, partners, predecessors
and successors in interest, and assigns and all other persons, firms, or corporations,
with whom any of the former have been, are now or may hereafter be affiliated." To
interpret "affiliate" as meaning one who has only a contractual relationship with the
former defendants is inconsistent with the intent demonstrated by the remainder of the
release. We are to avoid interpretations that create such inconsistencies. "Words in a
contract which are wholly inconsistent with its nature, or with the main intention of
the parties, are to be rejected." (Civ. Code, § 1653.)

Second, plaintiff and the former defendants agreed to keep the settlement terms
confidential. They agreed neither they nor their attorneys or representatives would
reveal "to anyone" any terms of the settlement agreement, including the release,
unless otherwise mutually agreed in writing. "The contracting parties could hardly
expect that persons thus barred from knowledge of the agreement... would be able to
take advantage of the release, or any other provision of the agreement. One cannot
enforce a contract of which one is ignorant, and if the contracting parties have
deliberately undertaken to hold their agreement in confidence, they cannot be
supposed to have meant to confer enforcement powers on those thus deliberately kept
in the dark. That contracting parties have bound themselves not to disclose their
contract to third persons is strong evidence that they intended not to invest such
persons with rights under it." (*Epic Communications, Inc. v. Richwave Technology,
Inc., supra,* 237 Cal.App.4th at pp. 1352-1353.)

The objective evidence before us thus demonstrates plaintiff and the former
defendants did not intend for defendant to be protected under the release. Defendant
was not an affiliate of Yosemite Auto as that term is commonly understood. Plaintiff
and the former defendants intended the release to apply only to those who had some
type of ownership, fiduciary, agency, or dependent relationship to the former
defendants, and defendant had no such relationship. Indeed, the parties intended that
defendant and other third parties would never know of the release, and thus would not
be in a position to enforce it.

We normally would turn to the extrinsic evidence defendant submitted to the
trial court to see if the release is susceptible to the interpretation he asserts.
Defendant's evidence of intent, however, consisted only of a declaration by his
attorney, submitted in support of the summary judgment motion, that when he, as
counsel for the former defendants, drafted the release, he intended it to apply to any

persons, known and unknown, including defendant. There is no evidence counsel expressed this intention to anyone. Counsel's undisclosed, subjective intent is irrelevant to interpreting the release's language objectively. (*Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc., supra,* 109 Cal.App.4th at p. 956.)

For additional support of his position, defendant points to plaintiff's express acknowledgment in the settlement agreement that the release was a general release, and to plaintiff's express waiver of his rights against a general release granted him under Civil Code section 1542. But these general provisions do not take precedence over the specific provisions of the release, which limited its scope to certain enumerated classes of persons, of which defendant was not one. Where general and specific provisions are inconsistent, the specific provision controls. (Code of Civil Procedure, § 1859; *Prouty v. Gores Technology Group* (2004) 121 Cal.App.4th 1225, 1235.)

Plaintiff also submitted extrinsic evidence, and it does not conflict with our interpretation of the release. The most relevant of this evidence consists of correspondence between his attorney and the former defendants' attorney as they negotiated the terms of the settlement agreement. Nowhere in this correspondence did either counsel suggest or indicate the release would apply to persons other than the negotiating parties or those groups of persons specified in the release.

In addition, plaintiff sent a copy of the complaint in this action to defendant's insurance carrier notifying it of the complaint and the allegations against defendant. In response, the insurer stated the complaint was "the first notice to [it] of a potential claim against [defendant]." This evidence does not conflict with the common meaning of the term "affiliate." Rather, it suggests the parties did not intend to immunize defendant.[1]

Because there is no conflict in the admissible extrinsic evidence, we interpret the release as a matter of law. Defendant was not an affiliate of the former defendants for purposes of the release agreement, and thus summary judgment should not have been granted in his favor. Because this finding resolves the appeal, we do not address the parties other arguments.[2]

DISPOSITION

The summary judgment is reversed and the matter is remanded for further proceedings consistent with this opinion. Costs on appeal are awarded to plaintiff. (Cal. Rules of Court, rule 8.278(a).)

We concur: BLEASE, Acting P. J. HULL, J.

---------

Notes:

[1]Plaintiff relies on his extrinsic evidence to argue the release extends *only* to the former
defendants. If we had to address that evidence in order to determine whether the settlement
agreement was ambiguous, we would conclude the evidence is inconsistent with the terms of the
release and thus inadmissible. By its express terms, the release applies to more persons than just
the former defendants. (See *Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343.)
However, because we have given the term "affiliate" its common meaning, and that meaning
favors plaintiff, we need not address his contention.

[2]The parties disagree on the standard of proof defendant would have to meet to establish he was
an intended third party beneficiary of the release. Plaintiff relies on *Neverkovec, supra,* 74
Cal.App.4th 337, which held a third party could not rely solely on a literal interpretation of the
contractual language to prove he was an intended third party beneficiary. (*Id.* at p. 348.)
Defendant relies on *Rodriguez v. Oto* (2013) 212 Cal.App.4th 1020, which held if the requisite
intent to make someone a third party beneficiary appears unambiguously from the face of the
contract, the third party makes a prima facie showing of entitlement merely by proving the
contract where the opposing party introduces no evidence to establish the contract is ambiguous.
(*Id.* at p. 1023; see *Epic Communications, Inc. v. Richwave Technology, Inc., supra,* 237
Cal.App.4th at p, 1349.) In *Cline v. Homuth* (2015) 235 Cal.App.4th 699, 706-710, our court
reviewed the divergent paths appellate courts have used to resolve third party enforcement of
general releases. However, under the circumstances of that case, we were not required to take
sides in the dispute, as the parties had offered additional evidence of intent at trial. (*Id.* at p. 710.)
In this case, we once again need not weigh in on the issue, as the language of the release was
unambiguous and no party introduced admissible extrinsic evidence suggesting otherwise.

---------

©2017 VersusLaw, Inc., format, enhancements and compilation.

# EXHIBIT 14

| # | Case Title | FF + 65 SF + 505 AF | INVESTIGATION COST FIXED | EQUIPMENT, PAPER, MAILING, PRINTING COST AVERAGE | TRAVEL COSTS AVERAGE | TOTAL COSTS | SETTLEMENT AMOUNT (BLACKED OUT TO PROTECY CONFIDENTIALITY) | NET FROM CASE (BLACKED OUT TO PROTECT CONFIDENTIALITY) |
|---|---|---|---|---|---|---|---|---|
| | STROJNIK SD DISTRICT COURT CASES AS OF 2020-03-20 FROM PACER | | | | | | | |
| 1 | Strojnik v. Pendry San Diego, LLC | $465 | $500 | $50 | $450 | $1,465 | | |
| 2 | Strojnik v. Torrey Pines Club Corporation | $465 | $500 | $50 | $450 | $1,465 | | |
| 3 | Strojnik v. Host Hotels and Resorts | $465 | $500 | $50 | $450 | $1,465 | | |
| 4 | Strojnik v. La Jolla Bed & Breakfast Inc. | $465 | $500 | $50 | $450 | $1,465 | | |
| 5 | Strojnik v. GHALP Parnership, L.P. | $465 | $500 | $50 | $450 | $1,465 | | |
| 6 | Strojnik v. CWI 2 La Jolla Hotel, L.P. | $465 | $500 | $50 | $450 | $1,465 | | |
| 7 | Strojnik v. Lizerbram | $465 | $500 | $50 | $450 | $1,465 | | |
| 8 | Strojnik v. Prospect Hospitality, LP. | $465 | $500 | $50 | $450 | $1,465 | | |
| 9 | Strojnik v. Bartell Hotels Management Company | $465 | $500 | $50 | $450 | $1,465 | | |
| 10 | Strojnik v. RNM Hospitality, Inc et al | $465 | $500 | $50 | $450 | $1,465 | | |
| 11 | Strojnik v. Marla K Hicks Trust | $465 | $500 | $50 | $450 | $1,465 | | |
| 12 | Strojnik v. 1315 Orange LLC | $465 | $500 | $50 | $450 | $1,465 | | |
| 13 | Strojnik v. Barrigon Inc | $465 | $500 | $50 | $450 | $1,465 | | |
| 14 | Strojnik v. Cherokee Lodge, LLC | $465 | $500 | $50 | $450 | $1,465 | | |
| 15 | Strojnik v. Indoc Partners, LLC | $465 | $500 | $50 | $450 | $1,465 | | |
| 16 | Strojnik v. Village 1017 Coronado, Inc. | $465 | $500 | $50 | $450 | $1,465 | | |
| 17 | Strojnik v. Kamla Hotels, Inc. | $465 | $500 | $50 | $450 | $1,465 | | |
| 18 | Strojnik v. San Diego Farah Partners, L.P. | $465 | $500 | $50 | $450 | $1,465 | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 19 | Strojnik v. Souldriver Lessee, Inc. | $465 | $500 | $50 | $450 | $1,465 | |
| 20 | Strojnik v. RBI Investors L.P. | $465 | $500 | $50 | $450 | $1,465 | |
| 21 | Strojnik v. Lafayette Landlord, LLC | $465 | $500 | $50 | $450 | $1,465 | |
| 22 | Strojnik v. Driftwood Capital Partners LLC | $465 | $500 | $50 | $450 | $1,465 | |
| 23 | Strojnik, Sr v. Cypress Inn Investors | $465 | $500 | $50 | $450 | $1,465 | |
| | | $10,695 | $11,500 | $1,150 | $10,350 | $33,695 | $40,750 | $7,055 |
| | | | | | | NET CASE AVERAGE | $306.74 |

